**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

FURNITUREDEALER.NET, INC,

                                 Civil No. 18-232 (JRT/HB)

                  Plaintiff,

v.                              **MEMORANDUM OPINION AND ORDER**
                                   **ON CROSS MOTIONS FOR SUMMARY**

AMAZON.COM, INC, and COA, INC.                 **JUDGMENT**
d/b/a COASTER COMPANY OF AMERICA

                  Defendant.

---

Christopher K. Larus, Ellen Levish, Francois Ecclesiaste, Jessica Lee Gutierrez, & John K. Harting, **ROBINS KAPLAN LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis MN 55402, for plaintiff;

Adam R. Steinert, Laura L. Myers, & Nirmani Chethana Perera, **FREDRICKSON & BYRON, PA**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402; Allyson R. Bennett, Joseph C. Gratz, & Vera Ranieri, **DURIE TANGRI LLP**, 217 Leidesdorff Street, San Francisco, CA 94111, for Defendant Amazon.Com, Inc;

Anna Tobin & Holley C. M. Horrell, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55402; Daniel M. Cislo, Kelly W. Cunningham, Mark D. Nielsen, Peter S. Veregge, & Rebecca Makitalo, **CISLO & THOMAS LLP**, 12100 Wilshire Boulevard, Suite 1700, Los Angeles, CA 90028; Robert J. Gilbertson, **FORSGREN FISHER MCCALMONT DEMAREA TYSVER LLP**, 225 South Sixth Street, Suite 1750, Minneapolis, MN 55402, for Defendant COA, Inc.

Plaintiff, Funituredealer.net ("FDN"), commenced this lawsuit against Defendants

Amazon.com ("Amazon") and COA, Inc. d/b/a/ Coaster Company of America ("Coaster")

asserting copyright infringement and violations of the Digital Millennium Copyright Act

("DMCA") against both Defendants and a breach of contract claim against Coaster. The

claims arise from a dispute over the use of product descriptions FDN wrote for Coaster (the "FDN Descriptions") on Amazon product detail pages.  The parties have filed cross motions for summary judgment.

The Court will deny, at least in part, all Motions filed by the parties.  First, genuine disputes of material fact remain as to whether FDN has a valid copyright in the FDN Descriptions.  Second, as to statutory damages on the copyright infringement claims, the question of whether the FDN Descriptions have standalone value is a factual question better left for the jury.  Third, genuine disputes of material fact remain as to whether the removal of the Nothing on this Page copyright notice constituted a violation under 17 U.S.C. § 1202(b)(1).  Fourth, a jury must determine the number of statutory violations of 17 U.S.C. § 1202(b)(1) committed by Defendants, if any.  Lastly, because Defendants have represented that they are withdrawing their affirmative defenses, the Court will deny FDN's motion for summary judgment on the affirmative defenses as moot.

The Court will also grant, in part, Defendants' motion.  As distribution under § 1202(b)(3) does not encompass mere public display of the work, the Court will grant Defendants' motion for summary judgment and dismiss this claim.

The Court will, however, make several further determinations that narrow the case as it proceeds towards trial.  First, 17 U.S.C. § 411(b) codified the affirmative defense of fraud on the Copyright Office and requires a showing of intent-to-defraud.  Defendants have failed to show, on summary judgment, that FDN intended to defraud the Copyright

Office.  Second, as to statutory damages on the copyright infringement claim, the Court finds that the independent economic value test is the most appropriate test to employ when evaluating whether something constitutes "one work."  Third, the Website Copyright Notice does not fall under the definition of copyright management information ("CMI") and therefore its removal cannot sustain a claim under the DMCA.  Fourth, FDN has shown that it is an injured party under the DMCA.

As for Coaster's motion for summary judgment, the Court will grant in part its motion for summary judgment as the Court finds that, based on the factual record, Amazon did not act as Coaster's agent.  As such, the Court will dismiss the direct copyright infringement, vicarious copyright infringement, and the DMCA claims.  The Court will deny in part Coaster's motion on the contributory copyright infringement claim as genuine disputes of material fact remain.  On the breach of contract claim, the Court finds that the Referral Provision is not preempted by the Copyright Act and genuine disputes remain as to breach and damages.  The Court will, however, grant Coaster's motion on the covenant of good faith and fair dealing claim as no evidence has been submitted to show Coaster acted dishonestly, maliciously, or otherwise in subjective bad faith.

## BACKGROUND

### I.      FACTUAL BACKGROUND

FDN is a Minnesota-based company that provides marketing and website services to the home furnishing industry.  (Decl. John K. Harting Supp. FDN's Mot. Partial Summ. J.

3

("1st Harting Decl."), Ex. 2, May 14, 2021, Docket No. 512.)   Coaster is a furniture wholesaler that reports annual revenues in the hundreds of millions of dollars.  (1st Harting Decl., Ex. 66 at 10.)  Amazon is the world's largest e-commerce retailer.  (Decl. John K. Harting Opp. Mot. Summ. J. Copyright Claim, ("2nd Harting Decl."), Ex. 20 at 21, June 25, 2021, Docket No. 545.)

**A. FDN's Relationship with Coaster**

One of FDN's primary services is to create, manage, and market websites for its clients.  (1st Harting Decl., Ex. 2 at 1.)  The websites FDN creates display product information of the client's furniture, including narrative product descriptions and product photos.  (1st Harting Decl., Ex. 3 at 2.)  FDN's clients will send the furniture product information to FDN, and FDN will either write or enrich both the product description and images. (Decl. Samuel J. Zeitlin Supp. Defs.' Mot. Summ. J. Copyright Claim, Ex. 13 at 26:9–22, 28:2–29:8, May 14, 2021, Docket No. 494.)

FDN maintains all its original content, including product descriptions, in its Content Library. (1st Harting Decl. , Ex. 9 at 18:23–20:20.)  FDN's Content Library is housed on two separate automated databases.  The first database is the Content Management System ("CMS"), which is used for editing and adding data.  (Zeitlin Decl., Ex 15 at 57:19–25; Zeitlin Decl., Ex. 16 at ¶ 30.)   The second database is called "FDealer" and is used as the primary vehicle that delivers product information onto the FDN managed websites. (Zeitlin Decl., Ex. 16 at ¶ 30.)  Product information is reformatted for consumption

optimization and then transferred from CMS into FDealer, but the underlying data between the two is identical. (*Id.*)  FDN has entered into agreements with other third-parties through which it licenses the product information in its Content Library for use and publication on the third-party's websites. (Zeiltin Decl., Exs. 7–10.)  The contractual language in the license agreements prohibits the third-party licensees to sell, license, share, copy, give away or allow the distribution of the Content Library. (*Id.*)

Coaster and FDN entered into a TailorYourSite Web Catalog Services and Licensing Agreement (the "2010 Agreement") on February 29, 2010. (1st Harting Decl., Ex. 3 at 1.) In the 2010 Agreement, Coaster contracted FDN to build and host a website for Coaster featuring a product catalog and integrated dealer locator. (*Id.*)  FDN agreed to create and enhance content for Coaster's website, including keyword enriching product descriptions. (*Id.*)  The 2010 Agreement stated that Coaster was provided a significantly discounted rate on FDN's services in exchange for Coaster facilitating new business for FDN. (*Id.* at 9.)  Specifically, Coaster agreed to refer its authorized dealers to FDN so FDN could then execute a website license agreement with them. (*Id.*)  The Agreement set forth that FDN retained all rights, title, and interest in the content, intellectual property, and design elements FDN used to provide services to Coaster and that Coaster was "not authorized to sell, license, share, copy or give away . . . any [FDN] . . . content . . . to any third party." (*Id.* at 1–2.)

Coaster provided its product information and FDN then created or enriched the product descriptions at issue in this case and published the enhanced product descriptions, the FDN Descriptions, on Coaster's website, which was hosted by FDN. (2nd Harting Decl., Ex. 15 at 55:3–56:10; Zeitlin Decl., Ex. 13 at 26:9–27:5; Zeitlin Decl., Ex. 14 at 37:3–44:9.)

As a part of FDN's relationship with Coaster, Coaster permitted FDN to set up a booth in Coaster's showrooms at major furniture trade shows throughout the year. (Decl. Daniel M. Cislo Opp. FDN's Mot. Partial Summ. J., Ex. A at 77:13–80:13, June 25, 2021, Docket No. 567.) Coaster's customers and retailers would visit these showrooms where FDN had a booth and would view furniture, place orders, and socialize. (*Id.*, Ex. B at 66:4–10; *id.*, Ex. D at 49:4–15.) Amazon would also attend these furniture shows as well and would visit Coaster's showroom. (*Id.*, Ex. D at 49:4–15; *id.*, Ex. E at 96:2–23, 198:23–199:8.)

**B. FDN's Copyright**

On September 22, 2015, FDN submitted an application for a copyright registration in the CMS database under the title of "Automated database of furniture catalogs and collections (photographs and text)." (Zeitlin Decl., Ex. 27.) FDN classified the work as an unpublished database. (*Id.* (the "u" in the registration number stands for

"unpublished").)[1]   The copyright registration application sought to copyright the "[c]ompilation, arrangement, original text, original photographs and revisions to certain prior photographs." (*Id.*) Following confirmation by the Copyright Office, FDN submitted a deposit copy of the CMS database along with its application. (Zeitlin Decl., Ex. 28 at 5, 6–8; Zeitlin Decl., Ex. 15 at 106:17–109:19.)

After almost two years and no movement on its application, FDN inquired into the status of its copyright registration. (Zeitlin Decl., Ex. 28 at 9–10.) On April 5, 2017, the Copyright Office notified FDN that it had misfiled its original deposit material. (*Id.*) FDN did not retain a copy of the original deposit. (Zeitlin Decl., Ex. 15 at 108:21–109:19.) The Copyright Office requested that FDN submit a replacement deposit of at least 50 representative pages or records of the CMS database. (Zeitlin Decl., Ex. 28 at 20.) FDN submitted a replacement deposit, which contained a printout of 100 separate and independent original textual descriptions with the accompanying model number. (*Id.* at 23.) FDN represented that the replacement deposit was a representative portion of the CMS database. (*Id.*) It is undisputed, however, that the replacement deposit was generated from the FDealer database, rather than the CMS database, though the data submitted with the replacement deposit was identical in both databases. (Zeitlin Decl.,

---

[1] *Administrative Copyright Classification Systems*, United States Copyright Office, available at https://www.copyright.gov/historic-records/admin-classification.pdf.

Ex. 16 at ¶¶ 46–47; Zeitlin Decl., Ex. 15 at 127:9–21; 2nd Harting Decl., Ex. 9 at 116:8–127:25.)

Correspondence ensued between the Copyright Office and FDN.  The Copyright Office asked for clarification as to FDN's original selection, coordination, and/or arrangement of the automated database and raised concerns that "the deposit material does not demonstrate any original, creative selection, coordination or arrangement[.]" (Zeitlin Decl., Ex. 28 at 21.)  FDN responded to the Copyright Office's concern stating that FDN "created and owns much of the original content" in the database and that FDN "selected, coordinated and arranged the underlying data as well as the database itself." (*Id.* at 23.)  The Copyright Office was apparently satisfied with this reply, as it then issued the copyright registration in the database as an unpublished work.  (Zeitlin Decl., Ex. 27.) The effective date of the copyright registration is September 22, 2015.  (*Id.*)

As stated above, FDN hosted Coaster's website—www.coasterfurniture.com.  (2nd Harting Decl., Ex. 8; 2nd Harting Decl., Ex. 16.)  On each specific product detail page, FDN included two copyright notices.  (*Id.*)  The first notice, the Nothing on this Page notice, appears in the middle of the product detail page and states: "Nothing on this page may be copied or reproduced without explicit permission."  (*Id.*)  The Nothing on this Page notice appeared above the FDN Descriptions on the product detail page.

The second notice, the Website Copyright Notice appears at the bottom of every product detail page and states that "Nothing on this page may be copied or reproduced

without explicit permission." (*Id.*)  The following figure is an enlarged image of the

Website Copyright Notice:



© 2006 - 2016 FurnitureDealer.net, Inc., All rights reserved.
Nothing on this page may be copied or reproduced without explicit permission.

(*Id.*)    The arrangement of the copyright notices in relation to the FDN Descriptions is

depicted in the following figure:



(Decl. Moon Hee Lee Supp. Defs.' Mot. Summ. J. 1202 Claims, Ex. 5, May 14, 2021,

Docket No. 504.)

### C. Defendants' Alleged Infringement

In 2014, Coaster entered into a Vendor Terms and Conditions Contract (the

"Vendor Contract") with Amazon, in which Amazon agreed to sell Coaster furniture on its

website. (1st Harting Decl., Ex. 22.) Coaster agreed to provide Amazon with product

information to facilitate Amazon's creation of the Coaster product detail pages on

Amazon.com. (*Id.*) The Vendor Contract specifically permitted Amazon to supplement

that product information with the information on Coaster's website. (*Id.*) Amazon

communicated to Coaster the importance of good-quality product descriptions and how

they can drive traffic to the website and result in higher customer sales. (2nd Harting Decl.,

Exs. 24–25, 27.) Amazon indicated that some of Coaster's product descriptions were "not

very good" and that it required more specific descriptions for the product detail pages.

(*Id.*, Ex. 29 at 106:3–107:21; *id.*, Exs. 32–33.) Amazon's team inquired about the product

descriptions appearing on FDN's website, as those descriptions were more detailed than

the product descriptions provided by Coaster. (*Id.*, Ex. 33.) Coaster indicated that these

product descriptions were owned by FDN. (*Id.*) Despite this, Amazon then scraped[2] the

FDN Descriptions from the Coaster website and uploaded them into its database to be

---

[2] Data scraping involves pulling information out or off of a website and compiling it. *What is Data Scraping? Definition & Usage*, Okta, https://www.okta.com/identity-101/data-scraping/.

displayed on Amazon's product detail pages for Coaster products.  (*Id.*, Exs. 38–39; *id.*, Ex. 37 at 54:10–55:19, 145:10–19.)

In 2013, FDN noticed that its product descriptions were appearing on Amazon's product detail pages.  (Zeitlin Decl., Ex. 23 at 222:5–223:19; Lee Decl., Exs. 21–22.)  FDN hired a third party to search the internet and submit a report to FDN of all instances where the FDN Descriptions appeared on other websites.  (Lee Decl., Ex. 7 at 137:20–140:4.)  FDN's initial investigation discovered hundreds of separate Amazon product detail pages for Coaster products that contained FDN Descriptions.  (1st Harting Decl., Ex. 40.)

FDN, on February 25, 2015, sent a DMCA takedown notice to Amazon accompanied by a spreadsheet identifying 394 examples of Amazon product detail pages for Coaster products that contained FDN descriptions.  (*Id.*)  Upon receipt of that letter, Amazon conducted a cursory internal investigation into the claims and confirmed that the FDN Descriptions identified in the letter were appearing on Amazon product detail pages.  (1st Harting Decl., Ex. 35 at 76:4–14, 77:4–82:1.)  Amazon internally concluded that at least some of these product descriptions had been supplied by third-party Amazon marketplace sellers.  (*Id.*)  Amazon also notified Coaster that FDN had sent the DMCA takedown letter.  (1st Harting Decl., Ex. 60.)

Amazon initially responded to FDN's letter stating it was "unable to accurately identify the items" referenced in FDN's correspondence and asked FDN to supplement its notice with more detailed information.  (1st Harting Decl., Ex. 43.)  FDN did so, sending

several further correspondences with the requested information.  (1st Harting Decl., Exs. 44–47.)  Amazon represented to FDN that it had been in contact with Coaster, who had provided Amazon with the product descriptions and who asserted that Coaster retained ownership rights over the descriptions.  (1st Harting Decl., Ex. 48.)  Amazon claimed it was unable to remove any of the listings identified by FDN because once it creates a product detail page, that page becomes a permanent catalog on Amazon.com.  (1st Harting Decl., Ex. 55.)  In a final correspondence prior to the commencement of this lawsuit, FDN advised Amazon that, based upon representations from Coaster to FDN, Coaster had not given permission for Amazon to use its product descriptions.  (1st Harting Decl., Ex. 56.)

Contrary to its prior assertions regarding the inability to remove product descriptions, in mid-2018 Amazon removed approximately 2,000 FDN Descriptions from its database.  (1st Harting Decl., Ex. 78.)

**D.  Amazon's Generation of Product Detail Pages**

As part of its development of a product detail page, Amazon must upload the product information for a product detail page into its database, including product descriptions.  (Decl. John Harting Opp. Mot. Summ. J. 1202 Claims ("4th Harting Decl."), Ex. 41, Ex. 10 at 145:2–148:2, Ex. 8 at 144:15–145:9, June 25, 2021, Docket No. 574.)  If Amazon wanted to make edits to that product information, it would have to re-upload the edited product descriptions to its database.  (4th Harting Decl., Ex. 21 at 210:1–216:21.)

In order to generate a product detail page, Amazon employs an algorithm to select different components of that page, including a product description. (4th Harting Decl., Ex. 22.) The algorithm uses a priority system. (*Id.*; 1st Harting Decl., Ex. 77 at 120:7–125:15.) If there is a vendor-provided product description, the algorithm will choose that product description to display. (*Id.*) If no vendor description is available, the algorithm will then select a third-party seller product description that has been rated A+ content, otherwise known as "enhanced brand content." (*Id.*) If a product description is not available from the first two sources, the algorithm will then select plain text product descriptions provided by third parties. (*Id.*)

## II.   PROCEDURAL HISTORY

FDN originally commenced this lawsuit against Amazon, later pleading in Coaster, in 2018. FDN alleges copyright infringement and violations of the DMCA against both Defendants. FDN also brought additional claims against Coaster. Coaster answered the Complaint and asserted counterclaims against FDN. (Answer to Am. Compl., Mar. 28, 2019, Docket No. 92.) Coaster brought a Motion to Dismiss FDN's claims against them. (Mot. Dismiss, July 6, 2018, Docket No. 35.) The Court denied Coaster's Motion as to every claim except for FDN's unjust enrichment claim. (Order Coaster's Mot. Dismiss, March 14, 2019, Docket No. 91.) FDN then brought a Motion to Dismiss Coaster's counterclaims, which the Court granted. (Order FDN's Mot. Dismiss, Aug. 8, 2019, Docket No. 137.) The parties have now filed Cross-Motions for Summary Judgment. (FDN's Mot.

13

Partial Summ. J., May 14, 2021, Docket No. 435; Coaster's Mot. Summ. J., May 14, 2021, Docket No. 447; Mot. Summ. J. Copyright Claim, May 14, 2021, Docket No. 491; Mot. Summ. J. 1202 Claim, May 14, 2021, Docket No. 501.)

FDN argues that it is entitled to partial summary judgment declaring that it owns a valid copyright, that Coaster breached its contract, and that Defendants' affirmative defenses should be dismissed. Defendants argue they are entitled to summary judgment on the copyright infringement claims and the DMCA claims. Coaster filed a separate Motion for Summary Judgment on all claims asserted against them, including the breach of contract claim.

**DISCUSSION**

**I.      STANDARD OF REVIEW**

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or

14

denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## II.   ANALYSIS

### A. Copyright Claims

FDN filed copyright infringement claims against both Amazon and Coaster. FDN asks the Court to grant it partial summary judgment and hold that FDN owns a valid copyright in the FDN Descriptions. Amazon and Coaster, collectively and independently, request that the Court grant them summary judgment on the copyright infringement claims because FDN lacks a valid copyright.

### 1.   Whether FDN's Copyright Covers FDN Descriptions

In order to prevail on a claim of copyright infringement, a plaintiff must prove (1) ownership of a valid copyright and (2) that original elements of the work were copied. *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). To establish ownership of a valid copyright, a plaintiff must show that its work is original, can be copyrighted, and that it has complied with all applicable statutory formalities. *Thimbleberries, Inc. v. C & F Enterprises., Inc.,* 142 F.Supp.2d 1132, 1137 (D. Minn. 2001). A certificate of copyright registration creates a rebuttable presumption of a valid copyright. *Id.*; 17 U.S.C. § 410(c). FDN, by attaching to the pleadings a copyright registration for the automated database

that includes the FDN Descriptions, created a rebuttable presumption of a valid copyright.

[3] Defendants raise two challenges to FDN's copyright.  First, they argue that the FDN Descriptions do not fall within the scope of FDN's copyright because the FDN Descriptions were previously published.[4]  Second, Defendants claim that FDN's copyright is invalid

---

[3] In response to FDN's Motion for Partial Summary Judgment, Defendants argue that the presumption of validity does not apply to the FDN Descriptions because they are only component parts of the entire database.  (Defs. Mem. Opp. at 20, June 25, 2021, Docket No. 560.)  Therefore, they conclude, the presumption only applies to the validity of the compilation as a whole.  (*Id.*) The Court has previously concluded that a copyright registration for a compilation also provides protection to the component works so long as the registrant holds rights to those component parts.  (Order Coaster's Mot. Dismiss at 12.)  In their Motion for Summary Judgment, Defendants state they do not seek to revisit this holding.  (Defs. Mem. Supp. Mot. Summ. J. at 16, May 14, 2021, Docket No. 493.)  Therefore, the Court need not consider this argument again, but rather concludes that the presumption of validity extends to the component parts of a compilation for the same reasons the Court adopted in its prior Order.

[4] FDN contends that the scope of the copyright is determined by the face of the application and correspondence with the Copyright Office.  In citing *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, it argues that because the face of the copyright application stated "original text," the Court must hold that the copyright covers the FDN Descriptions.  966 F.3d 46, 51 (1st Cir. 2020).  FDN states that the only way to invalidate the copyright, then, is to prove it is invalid under § 411(b).  It claims that any argument that the FDN Descriptions are outside the scope of the copyright registration is an attempt to end-run the requirements of the statute. FDN's argument is unpersuasive.

First, Defendants agree that based solely on the face of FDN's copyright application, the FDN Descriptions would be included in the copyright.  But Defendants argue that the FDN Description cannot fall within the category of "original text" in the copyright registration because the FDN Descriptions were previously published.  So, it does not necessarily matter what the copyright registration says if the FDN Descriptions were previously published.  If previously published, they cannot fall under the protection of a copyright in an **unpublished** work.  U.S. Copyright Office, Compendium of U.S. Copyright Office Practices ("Compendium") § 727 (3d ed 2021).

Second, FDN cites no case law to support its proposition that Defendants can only seek invalidation of a copyright under § 411(b) and are prevented from asserting that material is outside the scope of the copyright.  In fact, other courts have considered excluding material from

under 17 U.S.C. § 411(b).  Because genuine disputes of material fact exist as to whether FDN has a valid copyright in the FDN Descriptions, the Court will deny both Defendants' and FDN's Motions for Summary Judgment on the copyright claim.

### a.  Scope of FDN's Copyright

Publication is defined as either (1) "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending" or (2) "[t]he offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display." 17 U.S.C. § 101. Public display of a work does not, by itself, constitute publication.  *Id.*

A copyright registration for an unpublished database "does not cover any previously published or previously registered content that may be included in the database."  Compendium § 727.[5]  The Copyright Office has a "longstanding practice of precluding previously published material from a claim in a collective work[.]"  *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 2018 WL 2298197, at *3–4 (S.D. Cal. May 21, 2018) (citing the Compendium § 1008.2.)  Furthermore, the Copyright Office registration process

a copyright registration because the material fell outside the scope of the registration.  *See, e.g.*, *KEMA Inc. v. Koperwhats*, 2010 WL 3464737, at *3 & n.3 (N.D. Cal. Sept. 1, 2010).  Thus, the Court will consider Defendants' scope argument.

[5] The Copyright Office's Compendium is entitled to deference.  *See Asche & Spencer Music, Inc. v. Principato-Young Entm't, Inc*, 147 F. Supp. 3d 833, 836 (D. Minn. 2015); *see also Garner v. Sawgrass Mills Ltd. P'ship*, 94 WL 829978, at *8 n.5 (D. Minn. Dec. 22, 1994) ("[C]ourts ordinarily defer to the judgment of the Copyright Office.").

17

prevents a registrant from registering published and unpublished works together as it would be contrary to the statutory and regulatory requirements.  84 Fed. Reg. 66328, 66330 (Dec. 4, 2019); 83 Fed. Reg. 2542, 2545 (Jan. 18, 2018).  Instead, the Copyright Office provides for group registration—a process for registering both unpublished and published works separately but within the same application.  37 C.F.R. § 202.3(b)(5).  It is undisputed that FDN did not utilize the group registration process.  Since FDN has an unpublished copyright registration in its database, if its FDN Descriptions qualify as published, they fall outside the scope of its copyright and are not protected.

### i.   "Print this Page" Button

Defendants argue that the FDN Descriptions were published because they appeared on Coaster's website along with an intentionally placed "Print this Page" button.  FDN contends that regardless of the "Print this Page" button, the two copyright notices on the website prohibit the user from downloading, printing, copying or otherwise using the FDN Descriptions without permission.  FDN claims that this express limitation precludes a holding that the FDN Descriptions were published because FDN retained ownership of the descriptions regardless of whether a user printed the page.[6]  The Court

---

[6] FDN makes two other arguments that can be dealt with rather briefly.  First, FDN argues that the Court cannot hold the FDN Descriptions were published because the state of the law and guidance from the Copyright Office at the time of registration, 2015, did not address the impact of a "Print this Page" button on a works publication status.  FDN is incorrect. *Getaped.com v. Cangemi*, a leading case on publication via the internet, and which employs the same analysis used herein by the Court, was decided in 2002.  188 F. Supp. 2d 398, 401 (S.D.N.Y. 2002).  Further, while the Copyright Office's 2015 Circular 66 did discuss the effect of download buttons on

is tasked with determining whether an end user's ability to download and print the FDN Descriptions though language on the webpage restricted the use of those descriptions amounts to publication.

Neither party cites to case law that has squarely addressed the factual circumstances before the Court, nor has the Court found a case on point. Thus, the Court is left with little guidance. This is emblematic of a larger problem. The Copyright Act of 1976, enacted prior to the internet, struggles to address the nuances and novelty that can arise at the intersection of copyright law and technology. The fast-paced nature of modern technology makes it exceedingly difficult for courts to find proper solutions to unique legal issues while still appropriately applying the statute. The question facing the Court now is one of many examples of the ongoing challenges facing courts and litigants.

---

publication status, the 2014 Copyright Compendium did contain identical language to the 2021 Copyright Compendium on the impact of a download button. *See* Compendium of U.S. Copyright Office Practices § 1008.3 (Dec. 22, 2014), available at https://www.copyright.gov/comp3/docs/compendium-12-22-14.pdf.

Second, FDN contends that a genuine dispute of material fact remains because Defendants have not shown that any of the specific FDN Descriptions at issue here were actually displayed on a webpage containing the "Print this Page" button. Along with FDN's own admissions, Defendants have supplied ample evidence to demonstrate that each webpage which displayed an FDN Description contained a "Print this Page" button. FDN admitted in its interrogatory responses that "product descriptions . . . would have appeared on a webpage that included the . . . 'Print This Page' button or feature." (Zeitlin Decl., Ex. 34 at 4–5.) Testimony also indicates that the product detail pages appearing on www.coasterfurniture.com were generated using a template that included a "Print This Page" button. (Zeitlin Decl., Ex. 15 at 20:8–21:9, 99:10–15, 203:16–204:1.) FDN does not point to any evidence that disputes this fact and it cannot rely on a mere unsupported assertion to create one.

19

Now to the question at hand, no courts in the Eighth Circuit have even briefly addressed this issue. The few courts who have touched on the question have been guided by the principle that "[a] *sine qua non* of publication should be the acquisition by members of the public of a possessory interest in tangible copies of the work in question." *1 Nimmer on Copyright* § 4.07[A], at 4–43 (Matthew Bender, Rev. Ed. 2021). In *Getaped.com*, the court held that a source code that was used on the plaintiff's website was published when the website went live. 188 F. Supp. 2d at 402. After reviewing prior case law that had held posting music files, software, and photographs on websites violated distribution rights under § 106, amounting to publication, the court held that the determinative factor in resolving the publication status was "the ability of the Internet user to download a file containing copyrighted work and thereby gain control of it, that is gain a proprietary or possessory interest in the copyrighted work." *Id.* (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001); *Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*, 393 F. Supp. 1032, 1039 (S.D.N.Y. 1996); *Playboy Enters., Inc. v. Frena*, 839 F. Supp. 1551, 1556 (M.D. Fla. 1993). Similarly, in *Kernal Records Oy v. Mosley*, the court held that the music files were published because they were "not merely viewable (audible) on the Internet . . . [but] also available for downloading and copying." 794 F. Supp. 2d 1355, 1364 (S.D. Fla. 2011). Furthermore, the court noted that the copyright holder knew the work could be downloaded and copied and did not object. *Id.*

The Copyright Office has provided its own guidance on this issue. According to the Copyright Office, a work is published online when the copyright owner expressly or implicitly authorizes the end user to make retainable copies by "downloading, printing, or other means[.]" Compendium § 1008.3(C). The copyright owner may expressly authorize distribution by a statement that the work may be downloaded, or they may impliedly authorize distribution by providing a download option such as a download, print, save, or email button. Compendium §§ 1008.3(C)–(D). However, when there are indications on the website that the copyright owner has reserved copyright rights in the work or has explicitly prohibited reproduction or distribution of the work, the work may be unpublished. Compendium §§ 1008.3(D), 1008.3(F). The Compendium and the case law, though, is silent on the question of which expression of intent controls when both a download button and restrictions on the reproduction or distribution of a work are present.

Though the law is sparse, the ultimate issue for the Court to determine is whether FDN intended to authorize end users to make retainable copies of the FDN Descriptions. There is testimony that suggests FDN purposefully placed the "Print This Page" button on its website to "make it obvious" to visitors of the website that they could print the page and bring it into a furniture store. (Zeitlin Decl., Ex. 15 at 98:18–99:4, 197:19–199:3.) This was implemented after feedback from brick and mortar store representatives who stated that customers were already printing the page and that it was extremely useful. (*Id.*) This

evidence would suggest that FDN did intend to authorize users to retain copies of the FDN Descriptions.  On the other hand, testimony also suggests FDN intentionally placed the restrictions on use onto the webpages, and these restrictions were understood as FDN retaining its rights in the works.  (2nd Harting Decl., Ex. 8 at 127:10–128:17.)  This conflicting evidence makes it difficult for the Court to determine whether the public was able to acquire a proprietary or possessory interest in the work and what FDN's ultimate intent was in constructing the website and placing the FDN Descriptions there.

As the record stands before the Court, a genuine dispute of material fact remains as to FDN's intent to authorize the end user to gain control of the work, retaining a proprietary or possessory interest in it.  Intent is a question of fact better left for the jury. *In re Phillips*, 882 F.2d 302, 302 (8th Cir. 1989).  This conclusion is consistent with how other courts have analyzed the issue of publication via the internet.  *Rogers v. Better Bus. Bureau of Metro. Houstin, Inc.*, 887 F. Supp. 2d 722, 731 (S.D. Tex. 2012) ("[T]he reasons for finding publication varies from case to case and is fact dependent."); *Palmer/Kane LLC v. Gareth Stevens Publ'g.*, 2017 WL 3973957, at *12 (S.D.N.Y. Sept. 7, 2017) (holding that summary judgment was inappropriate because the question of publication involved factual issues such as the purpose behind why the work was posted online).  Because the question of publication depends on FDN's intent and because the evidence of its intent is conflicting, it is inappropriate for the Court to rule as a matter of law on the FDN Descriptions publication status.  This question must be left for the jury.

### ii.   Licensing Agreements with Third Parties

Defendants assert that the FDN Descriptions were also published via FDN's licensing agreements with third parties.  They contend that, prior to the copyright registration, FDN offered to distribute, and in some instances did distribute, the FDN Descriptions to large furniture dealers for potential display on their websites.  They argue that this constituted publication.

Publication has two definitions.  The second definition of publication states that "[t]he offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display" is publication under the statute.  17 U.S.C. § 101.  The Copyright Office has explained that "[p]ublication occurs [under the second definition] when one or more copies . . . are offered to a wholesaler, a retailer . . . or similar intermediaries for the purpose of distributing the work to the public . . . or publicly displaying the work."  Compendium § 1906.1.  The Copyright Office provides very little explication on the second definition of publication.

FDN entered into several licensing agreements with furniture retailers other than Coaster granting a license to those furniture retailers in FDN's Content Library.  (*See, e.g.*, Zeitlin Decl., Exs. 7–10.)  The Content Library contained the FDN Descriptions.  The purpose of the licensing agreements was to allow the furniture retailer access to product information so that they could then display the information on authorized applications, usually websites, to promote the retail sale of the products.  (Zeitlin Decl., Ex. 10 at § 1.)

Defendants claim that the licensing agreements constitute publication because the signing of the agreement was an offer to distribute the FDN Descriptions to a third party for further distribution or public display.

FDN disputes this characterization of its relationship with other furniture retailers. FDN first points to the restrictive language contained in the licensing agreements, preventing the furniture retailers from selling, licensing, sharing, copying, giving away or allowing the distribution of the Content by any other party.  FDN contends that this language is evidence that the agreements cannot constitute publication because the restrictive language prevents any interpretation of the agreements as requesting a third party further distribute or publicly display the work.

Based solely on the statutory language alone, Defendants have a strong argument that the licensing agreements constitute publication.  But, though only briefly mentioned by FDN, the Court must consider the doctrine of limited publication before resolving the issue.  Limited publication is an older doctrine, developed prior to the Copyright Act of 1976, which was established to "lessen the sometimes harsh effect" of the prior copyright statute's definition of publication. *Warner Bros. Ent., Inc. v. X One X Prods.*, 644 F.3d 584, 593 (8th Cir. 2011).  Though the doctrine was created prior to the Copyright Act of 1976, it continues to apply today.  1–4 Melville B. & David Nimmer, *Nimmer on Copyright* § 4.13.

A publication that is limited does not constitute legal publication under the Copyright Act. *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1145

(9th Cir. 2019).  If the licensing agreements constitute limited publications, then the FDN Descriptions were not published via those agreements.  The Eighth Circuit has held that a publication is general, rather than limited, if the rights-holder demonstrated an express or implied intent to abandon his right to control distribution and reproduction of his work, as determined from "the implications of his outward actions to the reasonable outsider." *Warner Bros. Ent.*, 644 F.3d at 593 (citing *Nucor Corp. v. Tenn. Forging Steel Serv., Inc.*, 476 F.2d 386, 390 n.7 (8th Cir. 1973)).  Particularly, the Eighth Circuit has held that something is a limited publication if it was distributed: (1) to a selected class of persons, (2) for a limited purpose, and (3) without the right of reproduction, distribution, or sale. *Id.*

Courts have held distributions to be limited publications in a variety of circumstances.  Where a copyright owner transferred a film print without the right of distribution or sale, but with the right to make a copy and diffuse the film (i.e., a license to broadcast the film), this constituted a limited publication.  *Burke v. Nat'l Broad. Co.*, 598 F.2d 688, 693 (1st Cir. 1979).  Distribution to the press for the purpose of enabling reporting was also found to constitute a limited publication.  *Estate of Martin Luther King, Jr., Inc. v. CBVS, Inc.*, 194 F.3d 1211, 1216 (11th Cir. 1999).  The Ninth Circuit, however, found that including a copyright notice that prohibited reproduction or alteration but not distribution or resale did not constitute a limited publication.  *Gold Value Int'l Textile,* 925 F.3d at 1146.

25

Here, FDN's licensing agreements appear more akin to a limited than general publication. FDN granted access to the FDN Descriptions to a limited number of persons—in particular, furniture retailers, and only four in total. FDN also had a limited purpose in distributing the FDN Descriptions as it restricted how the furniture retailers could use the FDN Descriptions. FDN explicitly limited the right to reproduce, distribute or sell the FDN Descriptions. FDN's actions do not indicate that it had an explicit or implicit intent to abandon its right to control and distribute the work. Indeed, the facts suggest otherwise: FDN likely included the restrictive language in an attempt to safeguard its rights.

On the factual record before the Court, the Court holds as a matter of law that FDN made a limited publication when it entered into licensing agreements with four other furniture retailers. Thus, the FDN Descriptions were not published because of those agreements.

### 2.   Validity of FDN's Copyright Under 17 U.S.C. § 411(b)

Defendants next argue that FDN's copyright is invalid under 17 U.S.C. § 411(b). A certificate of registration is prima facie evidence sufficient to meet the Copyright Act's requirement of registration prior to bringing an infringement suit. The registration is valid even if the certificate contains inaccurate information. 17 U.S.C. § 411(b)(1). However, a party can challenge the validity of a copyright registration under § 411(b) if the copyright registrant included the inaccurate information "with the knowledge that it was

inaccurate" and "the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."  17 U.S.C. § 411(b).  When a court finds that a copyright registrant knowingly provided inaccurate information in the registration, "the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration."  17 U.S.C. § 411(b)(2).

Defendants claim that FDN knowingly included two pieces of inaccurate information in its copyright registration.  First, Defendants state that it was a knowing and inaccurate representation to submit a replacement deposit composed of data from FDealer rather than the CMS database.  Defendants claim the replacement deposit contained inaccurate information because the copyright registration is for CMS, not FDealer.  Second, Defendants assert it was a knowing and inaccurate representation to claim that the FDN Descriptions were unpublished.  FDN disagrees, arguing that § 411(b) codified the affirmative defense of fraud on the copyright office and because Defendants have failed to demonstrate any fraudulent conduct by FDN, their attempt to invalidate the registration is unavailing.

As the issue is dispositive, the Court must first determine whether § 411(b) does in fact codify the affirmative defense of fraud on the Copyright Office.  The Eighth Circuit

has yet to reach this issue, and the Circuit Courts who have addressed it are split.[7]   The

Eleventh Circuit, in citing guidance from the Copyright Office, held that § 411(b) "codifies

the defense of Fraud on the Copyright Office."  *Roberts v. Gordy*, 877 F.3d 1024, 1029

(11th Cir. 2017).   Similarly, the Seventh Circuit mentioned that § 411(b)(1) requires a

showing of fraud on the Copyright Office before moving on to the process laid out in §

411(b)(2).  *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 618 (7th Cir. 2013).

The Ninth Circuit has held otherwise.   Reversing course from prior rulings,[8] the Ninth

Circuit held that based upon the plain language of § 411(b), fraud is not required to

invalidate a copyright registration if a party can demonstrate that the claimant included

inaccurate information with the knowledge that it was inaccurate.  *Gold Value Int'l Textile,*

---

[7] The Supreme Court recently issued an opinion in *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, holding that § 411(b) does not distinguish between a mistake of law and mistake of fact and that lack of factual or legal knowledge can excuse an inaccuracy in the copyright registration.  142 S. Ct. 941 (2022).  The Supreme Court held that § 411(b) does require actual knowledge, thus, if a copyright owner did not actually know there was an inaccuracy in their copyright registration, the registration cannot be invalidated under § 411(b).  *Id.*  Though originally presented with the question at the crux of the Circuit split—whether § 411(b) requires a showing of fraud—the Supreme Court did not directly answer that question as the parties shifted away from this issue in their briefs and oral argument.  *See id.* at 949–50 (Thomas, J., dissenting).   Because the Supreme Court did not directly address the question of fraud in *Unicolors*, the Court must still consider that issue here on the Motions for Summary Judgment.

[8] Prior to *Gold Value*, the Ninth Circuit had held twice before that a showing of fraud was required to invalidate a copyright registration under § 411(b).  In *L.A. Printex Industries, Inc. v. Aeropostale, Inc.*, accompanying their review of § 411(b), the Ninth Circuit stated that "inadvertent mistakes on registration certificates do not invalidate a copyright . . . unless . . . the claimant intended to defraud the Copyright Office by making the misstatement."  676 F.3d 841, 853 (9th Cir. 2012).  And again, in *Unicolors, Inc. v. Urban Outfitters, Inc.*, the Ninth Circuit cited *L.A. Printex* for its discussion on § 411(b) and fraud, and held that "[g]ood faith mistakes in copyright applications do not  preclude an infringement action."  853 F.3d 980, 991 (9th Cir. 2017).

*Inc. v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1147 (9th Cir. 2019).  The court in *Gold Value* relied solely on the plain text of § 411(b) and did not discuss or analyze either Congress's purpose when it amended the statute or the guidance from the Copyright Office on § 411(b).  Nor did the court consider the long-standing common-law rule which prevented inadvertent mistakes on registration certificates from invalidating a copyright registration.

When § 411(b) was originally added to the statute, the Copyright Office stated that "section 411 of the copyright law [was amended] to codify the doctrine of fraud on the Copyright Office in the registration process."  U.S. Copyright Office, *Annual Report of the Register of Copyrights, Fiscal Year Ending September 30, 2008*, 12–13 (2008).  A second report a year later further clarified that § 411(b) was added "to create a new procedure for infringement actions . . .  on issues that may involve fraud on the Copyright Office."  U.S. Copyright Office, *Annual Report of the Register of Copyrights*, at 9 (2009).  Most recently, the Copyright Office solidified it understanding of § 411(b), stating that "[a] copyright registration should not be invalidated—and the copyright owner's ability to enforce the copyright compromised—when the application was submitted in good faith based on a reasonable interpretation of the law."  (2nd Harting Decl., Ex. 53 at 18 (Response of the Register of Copyrights, *Fashion Ave. Sweater Knits, LLC v. Poof Apparel Corp.*, No. 2:19-cv-06302, ECF 129-1 (C.D. Cal. Feb. 8, 2021)).

The backdrop of the common law prior to § 411(b)'s enactment further supports the conclusion that § 411(b) codified the longstanding fraud on the Copyright Office doctrine.  Prior to the 2008 amendment, every Circuit who had addressed this issue had agreed that innocent or inadvertent errors, including errors resulting from a good-faith legal misunderstanding, did not bar infringement actions.[9]  These court rulings culminated in a leading treatise summarizing the common law as holding that "a misstatement or clerical error in the registration application, if unaccompanied by fraud, should neither invalidate the copyright nor render the registration certificate incapable of supporting an infringement action."  2 *Nimmer on Copyright* § 7.20.

"When a statute covers an issue previously governed by the common law, we must presume that Congress intended to retain the substance of the common law" unless statutory purpose to the contrary is evident.  *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013) (cleaned up).  Congress did not suggest, nor did it expressly state, that its intention in amending § 411(b) was to silently overrule a century of widely accepted

---

[9] *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1161 (1st Cir. 1994), *abrogated on other grounds Reed Elsevier Inc. v. Muchnick*, 559 U.S. 154 (2010); *Raquel v. Educ. Mgmt. Corp.*, 196 F.3d 171, 177 (3d Cir. 1999), *judgment vacated on other grounds,* 331 U.S. 952 (2000); *Eckes v. Card Prices Update*, 736 F.2d 859, 861–62 (2d Cir. 1984); *Bouchat v. Balt. Ravens, Inc.*, 241 F.3d 350, 357 (4th Cir. 2001); *Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 904 (11th Cir. 1986); *Advisers, Inc. v. Wiesen-Hart, Inc.*, 238 F.2d 706, 707 (6th Cir. 1956); *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 591 (7th Cir. 2003); *Urantia Found. v. Maaherra,* 114 F.3d 955, 963 (9th Cir. 1997).

common law principles.  In fact, all indications from Congress support the view that its intention behind the 2008 amendments was to protect copyright owners.

Congress amended the statute to "improve intellectual property enforcement . . . and eliminat[e] loopholes that might prevent enforcement of otherwise validly registered copyrights."  H.R. Rep. 110-617 at 20 (2008).  Congress gave no indication that it intended to drastically change the prevailing norm in copyright law that good faith inaccuracies in a copyright registration will not invalidate that registration.  If anything, it would be more reasonable to assume Congress, based on Congress's purpose, would have wanted to afford more protection to copyright holders, not less.

Furthermore, holding that § 411(b) does not require a showing of fraud would allow any alleged infringer to challenge the validity of a copyright registration because it contained any inaccuracy that the copyright owner knew about.  Even if an infringer knows the inaccuracy to be minor, they could abuse this loophole and tie up valid copyright registrations in litigation for years.  This would not only place a burden on the courts, but it would also burden the Register of Copyright in having to respond to inquiries from the courts.

The Court finds that § 411(b) did codify the affirmative defense of fraud on the Copyright Office and requires a showing of intent-to-defraud.  That is, if a copyright registration includes an inadvertent or good faith inaccuracy, the copyright cannot be invalidated under § 411(b).  This is in line with Congress's purpose, the Copyright Office's

specific guidance, other Circuit Courts, the well-established common law principles in existence at the time the statute was passed, and is not contrary to the plain text of § 411(b).

As such, the Court must determine whether a genuine dispute remains that the inaccurate pieces of information included in FDN's copyright registration were made in good faith. FDN's use of FDealer rather than CMS to compile the data for its replacement deposit constitutes a good faith inaccuracy. The underlying data that was submitted from FDealer was identical to the data that would have been found in CMS. Though the organization of that data would have been different, Defendants have not pointed to any evidence that would suggest that FDN knew it was improper to compile the replacement deposit using FDealer or that FDN was intentionally making a misrepresentation to secure a copyright registration. Rather, the evidence shows that FDN believed use of FDealer over CMS was immaterial because the data was identical. Nor have Defendants presented any argument that the FDealer database was more likely to be entitled to copyright protection than the CMS database, so there seems to be no apparent reason why FDN would intentionally choose FDealer over CMS. As such, FDN's use of FDealer to generate the replacement deposit constitutes a good faith inaccuracy.

FDN's representation that the FDN Descriptions were not previously published does not rise to the level of an inaccuracy. As discussed above, whether the FDN Descriptions were published is unclear and is a question better left for a jury who can

determine FDN's intent.  Furthermore, the state of the law at the time FDN submitted its copyright registration was uncertain and conflicting, and as evidenced by the lengthy discussion in this Order, it remains so to this day.  Even if a jury finds that the FDN Descriptions were published, on the record before the Court, no genuine dispute exists that FDN's understanding of the law constitutes a good faith legal error and was a reasonable interpretation of the law at the time.  Thus, at this stage, the Court finds that Defendants have failed to overcome the presumption of validity in FDN's copyright under § 411(b).[10]

### 3.    Statutory Damages

Defendants ask the Court to limit FDN's statutory damages if it was to prevail on its copyright infringement claim.  Defendants claim the damages should be limited because the FDN Descriptions constitute only one work.  Defendants further argue that if the Court finds the FDN Descriptions constitute one work, then FDN is not entitled to any statutory damages because the infringement occurred prior to the registration of the work.

### a.  Whether FDN's Descriptions Constitute One Work

Defendants claim that since FDN's copyright is in a database, it is only entitled to seek one award of statutory damages because the database is one work.  A copyright

---

[10] This conclusion does not bar Defendants from arguing fraud under § 411(b) to the jury if they can present evidence that demonstrates FDN's intent to defraud.

plaintiff is entitled to seek "an award of statutory damages for all infringements involved in the action, with respect to any one work[.]"  17 U.S.C. § 504(c)(1).  Section 504(c)(1) is certainly not a model of clarity, especially when discussing a copyright owner seeking separate awards of statutory damages.  The statute does not define the term "one work," but it does clarify that "all parts of a compilation or derivative work constitute one work." *Id.*  The Copyright Office has offered its opinion on the issue, stating that since a database is, by definition, a compilation, the plaintiff "may be entitled to seek only one award of statutory damages for the database as a whole[.]"  Compendium § 1112.3; 81 Fed. Reg. 86643, 86654 (Dec. 1, 2016).

But courts look beyond the statutory text and the guidance from the Copyright Office in determining whether a compilation constitutes one work.  Instead, courts have used a variety of approaches when analyzing whether a copyright plaintiff can recover multiple statutory damages for infringement of the component works of a compilation. Three different tests have been employed: (1) the registration test, (2) the compilation test, and (3) the independent economic value test.  The Eighth Circuit has not weighed in on which particular test this Circuit should utilize.

Defendants advocate for the Court to apply either the registration test, the compilation test, or a combination of both.  The registration test, followed in the Fourth and Fifth Circuits, states that, based on the plain text of the statute, the court need look no further than the fact that the registered work is a compilation to hold that only one

34

award of statutory damages is available.  *Xoom, Inc. v. Imageline, Inc.*, 323 F3d 279, 285

(4th Cir. 2003); *Cullum v. Diamond A Hunting, Inc.*, 484 F. App'x 1000, 1002 (5th Cir. 2012).[11]

The compilation test, followed by the Second Circuit, turns on the question of whether

the copyright holder issued the works separately or together as a unit.  *Bryant v. Media

Right Prods.*, 603 F.3d 135, 141 (2d Cir. 2010).  The only court in this district to have

considered the question applied a combination of both the registration and compilation

tests.  *Adventure Creative Grp., Inc. v. CVSL, Inc.*, 412 F. Supp. 3d 1065, 1072 (D. Minn.

2019).

FDN argues that the independent economic value test is most appropriate.  This

test requires the Court to charge the jury with the question of whether the protected

works—here the FDN Descriptions—have value only as a compilation or have standalone

economic value.  *Sullivan v. Flora, Inc.*, 936 F.3d 562, 571 (7th Cir. 2019).  If a component

work has standalone value, the copyright owner is entitled to statutory damages for

infringement of each independent work.  The independent economic value test has been

adopted in the First, Seventh, Ninth, Eleventh, and D.C. Circuits.  *Id.; Gamma Audio &

Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1117 (1st Cir. 1993); *Columbia Pictures Indus. v.

Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1193 (9th Cir. 2001); *MCA Television

---

[11] Neither case contains a lengthy discussion of the available tests nor analyzes why the registration test is most appropriate.  Rather, the courts merely state that based on the plain language of the statute, if a work was registered as a compilation, it constituted one work for the purposes of statutory damages.

*Ltd. v. Feltner*, 89 F.3d 766, 769 (11ᵗʰ Cir. 1996); *Walt Disney Co. v. Powell*, 897 F.2d 565, 570 (D.C. Cir. 1990).

Whether a compilation is issued only as a unit or whether its component works are issued separately, the question central in *Bryant*, is relevant to the inquiry required under § 504(c)(1), but it is too limited.  To employ the compilation test would foreclose a possibility that Congress provided for in the statute—adequate recovery for infringement of multiple works available in the market as a compilation, but which have discernable value at an individual level.  The independent economic value test allows for a court to consider this broader analysis.

The independent economic value test is more functional than formal, looking at the economic value of a protected work rather than only considering the vehicle through which the particular copyright owner chose to protect the work.  The analysis requires the Court to determine where the market would assign value.  *Sullivan*, 936 F.3d at 572. The analogy referenced in *Sullivan v. Flora* is particularly apt: "think . . . of the multiple protected works as a quilt and then ask whether any one individual patch has discernable, independent economic value—whether once separated from the quilt a particular patch lives its own copyright life (as 'one work')—or instead whether the value lies in the patches' combined assembly into the quilt as a whole (as a 'compilation')."  *Id*.  So, while the compilation and even the registration inquiries are relevant to the overall

determination of whether the FDN Descriptions had independent economic value apart from the database, they do not constitute the entire analysis.

Furthermore, the independent economic test better aligns with the spirit of the Copyright Act and the Court's prior holdings.  Requiring a copyright owner to register potentially thousands of component parts separately in order to recover appropriate statutory damages when infringement occurs would be overly burdensome and contrary to the purpose of the Copyright Act.  *Metropolitan Regional Inf. Sys. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 597 (4th Cir. 2013) ("[A]dding impediments to automated database authors' attempts to register their own component works conflicts with the general purpose of Section 409 to encourage prompt registration.")  In this vein, the Court pointed to the exact same congressional purpose in its Order on Coaster's Motion to Dismiss, explaining that its holding was guided by this particular purpose.  (Order Coaster's Mot. Dismiss at 12.)

This Court finds that the most appropriate test in determining whether a copyright owner is entitled to more than one statutory damage is the independent economic value test, which incorporates the tenets of both the registration and compilation test.  Thus, the question of statutory damages turns on whether the FDN Descriptions have standalone value, which can be shown through evidence of the work's distinct and discernable value to the copyright holder or and its value assigned by the market.  *Sullivan*, 936 F.3d at 571.  Relevant to this determination is the way the owner marketed

the work product, as a compilation or individually.  Ultimately, this is a question better left for the jury as genuine questions of material fact remain as to whether the FDN Descriptions have standalone value.

### b.  Infringement Prior to Registration

17 U.S.C. § 412 states that "no award of statutory damages . . . shall be made for . . . (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration[.]"

Since this issue turns on whether the FDN Descriptions constitute one work or several, the Court can only consider this question once the jury has resolved the preliminary matter.  The Court does note, however, that both parties agree that at most FDN is entitled to damages for the 433 FDN Descriptions which have been identified as being infringed after the 2015 registration date.

### 4.  Copyright Infringement Claims Against Coaster

Coaster has filed its own Motion for Summary Judgment on the copyright infringement claims.  FDN asserted direct, contributory, and vicarious copyright infringement claims against Coaster which Coaster now asks the Court to grant summary judgment on.[12]

---

[12] As an initial matter, FDN argues that Coaster's Motion for Summary Judgment should be denied because Coaster failed to sufficiently engage with the factual record and instead simply stated that Coaster was not aware of and FDN had not pointed to any evidence in the record to

### a. Direct Copyright Infringement

To establish a claim for direct copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) that the defendant copied the original elements of its work. *Mulcahy v. Cheetah Learning LLC,* 386 F.3d 849, 852 (8th Cir. 2004).   The copyright owner must show that the infringer violated its exclusive rights reserved under 17 U.S.C. § 106 including the right to reproduce the work, distribute copies of the work, and publicly display the work.

Coaster correctly points out that FDN has not produced any evidence which shows that Coaster itself violated any of FDN's rights under § 106.[13]  Coaster did not reproduce, distribute, or publicly display the FDN Descriptions.

FDN argues that the Court should not grant summary judgment to Coaster on the direct copyright infringement claim because Coaster can be held liable under agency principles.  Under copyright law, a principal can be held liable for direct copyright

---

establish the claims.  FDN's argument is unpersuasive.  The Eighth Circuit has stated that the standard for the moving party "is far from stringent, for it is sufficient if the movant points out that the record does not contain a genuine issue of material fact and identifies that part of the record which bears out this assertion.  This is an obligation regularly discharged with ease by parties who desire summary judgment[.]"  *Handeen v. Lemaire*, 112 F.3d 1339, 1346 (8th Cir. 1997).  Though Coaster reserved several of its detailed arguments for its reply brief, inhibiting FDN from addressing Coaster's arguments in its briefing, Coaster's actions do not warrant the Court refusing to consider Coaster's entire motion.  The standard for summary judgment on this issue is low, and Coaster has met it here.

[13] FDN argues that direct copyright infringement occurred when Coaster communicated with Amazon regarding the descriptions.  But FDN fails to clearly explain how these communications constitute reproduction, distribution, or public display when it was Amazon who was the one to scrape and then subsequently use the FDN Descriptions on Amazon.com.

infringement of its agent. *Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*,

689 F.3d 29, 56 (1st Cir. 2012). "[A]n agency relationship results from the manifestation

of consent by one person that another shall act on his behalf and subject to his control,

with a correlative manifestation of consent by the other party to act on his behalf and

subject to his control." *Moss v. Vadman*, 77 Wn.2d 396, 402–03 (Wash. 1969).[14]  Thus,

the two elements of an agency relationship are mutual consent and control. *Uni-Com NW*

*v. Argus Pub. Co.*, 47 Wn. App. 787, 796 (Wash. Ct. App. 1987).  Control exists if the

principal controls the manner of performance. *Id.* at 797.

FDN contends that both mutual consent and control were present.  FDN states that

Coaster contractually authorized Amazon to conduct work on its behalf because Coaster

did not have the technical ability to provide the FDN Descriptions.  The contracts between

Amazon and Coaster allow Amazon to collect product information from Coaster's

website.  (Decl. John Harting ("3rd Harting Decl."), Exs. 6–7, June 25, 2021, Docket No.

551.)  These contracts, FDN claims, establish that Coaster manifested its consent to

Amazon acting as Coaster's agent in compiling product information.  FDN argues that

Amazon manifested its consent to be Coaster's agent by entering into these agreements,

scraping the FDN Descriptions, and seeking approval from Coaster that the scraped

descriptions were acceptable for use on Amazon's product detail pages.  (*See, e.g.*, 3rd

---

[14] FDN asserts the agency relationship was created through the contracts between Coaster and Amazon.  Therefore, Washington law applies pursuant to the governing law clause of the contracts.  (*See, e.g.*, Ko Decl., Ex. 1 at ¶ 4(i).)

Harting Decl., Ex. 26 (detailing communications between Coaster and Amazon regarding a specific product description).)  Lastly, FDN maintains that Coaster exercised control over Amazon as its agent because had Coaster told Amazon not to use the FDN Descriptions, Amazon would have listened.  (3rd Harting Decl., Ex. 24 at 230:11–20 ("I have no reason to believe why we wouldn't heed Coaster's request if it was made in a hypothetical situation.").)

While FDN relies heavily on the contracts between Coaster and Amazon to establish that an agency relationship exists, FDN glosses over key contractual language that undermines its assertion.   The Amazon Fulfillment Services Agreement, an agreement between Coaster and Amazon, states that "[t]his Agreement will not create the relationship of agency[.]"  (3rd Harting Decl., Ex. 7 at ¶ 25.8.)  The Strategic Vendor Services ("SVS") Agreement, another agreement between Coaster and Amazon, states that "[n]either party will have . . . any authority to bind or enter into any agreement on the other party's behalf."  (Decl. Hurr Ko Supp. Coaster's Mot. Summ. J., Ex. 1 ¶ 4(k), May 14, 2021, Docket No. 450.)  The SVS goes on to state that "Amazon may determine the content, appearance, functionality, and all other aspects of its website **in its sole discretion**[.]"  (*Id.* ¶4(b) (emphasis added).)   The contract language evidences that Amazon did not consent to being Coaster's agent, that it explicitly rejected such a notion, and that Amazon retained sole control over what appeared on its website.

Nor did Coaster control Amazon's actions. "Control is not established if the asserted principal retains the right to supervise the asserted agent merely to determine if the agent performs in conformity with the contract." *Uni-Com*, 47 Wn. App. at 796–97. Notwithstanding the fact that FDN's evidence that Coaster exercised control over Amazon's actions is thin, it is also simply insufficient to establish the element of control required under agency law. FDN points to several emails between Coaster and Amazon where Amazon asked Coaster to review product descriptions. What these emails show, at best, is that Coaster was supervising Amazon and its actions to ensure conformity with the contract, which is not enough to establish control. The emails demonstrate that Amazon and Coaster had a typical business relationship where the parties were working towards a common goal and trying to comply with their contractual obligations. Coaster never controlled the manner in which Amazon collected the product descriptions, how it compiled its data, or how it produced the product detail pages. And FDN's assertion that Amazon testified it would hypothetically have heeded a request from Coaster to take down a product description does not demonstrate that Coaster controlled Amazon's manner of performance, merely that Amazon would have been amenable to requests from its business partner.

On the factual record, FDN has failed to show that Amazon acted as Coaster's agent and Coaster therefore cannot be found liable for direct copyright infringement. The facts do not show that Amazon manifested consent to act on Coaster's behalf nor that Coaster

42

exercised control over Amazon.  Thus, the Court will grant Coaster's Motion for Summary Judgment on the direct copyright infringement claim.

### b. Contributory Copyright Infringement

A defendant is liable for contributory copyright infringement when it "(1) induced, caused, or materially contributed to the infringing conduct of another, and (2) knew of the infringing activity."  *Rottlund Co., Inc. v. Scott Larson Constr., Inc.*, 2004 WL 742054, at *6 (D. Minn. Mar. 4, 2004) (citing cases).  A defendant who provided the copyrighted work to a third party who then in turn copied that work may be liable as a contributory infringer unless the defendant had no knowledge that the third party intended to infringe. *Id.* (citing 3 *Nimmer* § 12.04[A]).

The evidence presented by FDN shows that a genuine dispute exists as to whether Coaster induced, caused, or materially contributed to the alleged infringement of the FDN Descriptions.  Coaster entered into contracts with Amazon that authorized Amazon to collect product information from Coaster's website, which was managed by FDN at the time.  Coaster knew that FDN had copyright rights in the product information housed on its website.  Communications between Coaster and Amazon show that Coaster approved the use of certain FDN Descriptions by Amazon.  And significantly, a genuine dispute of material fact remains as to whether Coaster represented to Amazon, after Amazon informed Coaster of the DMCA Takedown request from FDN, that Coaster itself owned the product descriptions rather than FDN.  (3rd Harting Decl., Ex. 48.)

43

A genuine dispute remains as to the knowledge requirement of a contributory copyright infringement claim as well. The agreement between FDN and Coaster stated that FDN retained all right, title, and interest in the content and evidence demonstrates Coaster was aware that Amazon scraped the FDN Descriptions from www.coasterfurniture.com. Coaster became explicitly aware of the alleged infringement in 2016 when FDN sent its DMCA takedown request. Thus, evidence exists from which a reasonable jury could conclude Coaster knew of the infringing conduct as early as 2016.

The record before the Court demonstrates that a genuine dispute of material fact remains as to whether Coaster can be found liable for contributory copyright infringement. A jury is best situated to weigh the evidence and credibility of the testimony to make a determination on Coaster's liability. Therefore, the Court will deny Coaster's Motion for Summary Judgment on the contributory copyright infringement claim.

### c. Vicarious Copyright Infringement

In order to establish vicarious copyright infringement liability, a copyright owner must demonstrate that the defendant: (1) possessed the right and ability to supervise the infringing activity and (2) possessed an obvious and direct financial interest in the exploited copyright material. *Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 834 (8th Cir. 1992). A party infringes vicariously if they profit from direct infringement while "declining to

exercise a right to stop or limit it[.]" *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).

Coaster certainly possessed a direct financial interest in the FDN Descriptions as the record demonstrates that Coaster lacked the high-quality descriptions Amazon was looking for and Coaster itself recognized the impact the FDN Descriptions had on increasing sales. In discussing the removal of FDN Descriptions from Coaster products on Amazon, Coaster's E-Commerce Director Mehdi Gold stated "Please be advised that this will heavily impact our sales[.]" (3rd Harting Decl., Ex. 74.) Gold later confirmed in his deposition that the removal of FDN Descriptions caused Coaster's conversion rate[15] to decline by 50% or more. (3rd Harting Decl., Ex. 20 at 79:2–14.)

But the main issue here for FDN is proving the first element of a vicarious copyright infringement claim—that Coaster had the ability to supervise Amazon's conduct. Similar to the direct copyright infringement claim, FDN cannot establish this. FDN, relying upon two emails and testimony, argues that Amazon routinely sent Coaster FDN Descriptions for Coaster's approval and that Amazon would have removed FDN Descriptions from Amazon had Coaster told them to. Outside of FDN's evidence being incredibly thin, and its reliance on testimony entirely speculative, FDN's argument that Coaster possessed the right and ability to supervise Amazon's activity or even the right to stop or limit it is

---

[15] The conversion rate is the rate of how many consumers that visit the page then purchase that product.

undercut by the language in the SVS where Amazon reserved the right to control what appeared on its website to its "sole discretion."  (Ko Decl., Ex. 1 ¶ 4(b).)  FDN has not presented sufficient evidence to demonstrate that a genuine dispute of material fact exists on the vicarious liability claim.  Thus, the Court will grant Coaster's Motion for Summary Judgment as to vicarious liability.

### B.  DMCA Claims

FDN claims that Defendants actions violated the DMCA as well because when they copied the FDN Descriptions they removed the two copyright notices that appeared on www.coasterfurniture.com's product detail pages.  Defendants request that the Court grant summary judgment to them on the DMCA claims and dismiss them for a variety of reasons, each of which is addressed below.

Among other provisions, the DMCA prohibits "intentionally remov[ing] or alter[ing] any copyright management information."  17 U.S.C. § 1202.  A variety of types of information can constitute CMI so long as it is conveyed in connection with copies, performances or displays of a work.  As relevant here, information that is CMI includes (1) notices of a copyright; (2) identifying information about the author or copyright owner of a work; or (3) terms and conditions for use of a work.  17 U.S.C. § 1202(c).  The DMCA further prohibits "distribu[ion of] . . . works [or] copies of works . . . knowing that CMI has been removed or altered without authority of the copyright owner or the law."  17 U.S.C. § 1202(b)(3).  The DMCA requires that the defendant know or "hav[e] reasonable grounds

to know, that [removal or alteration of CMI] will induce, enable, facilitate, or conceal an infringement of any right under this title."   *Id.*

### 1.   Whether the Notices are CMI

CMI must be conveyed in connection with a work in order to fall under the statutory definition of CMI.  This is in line with the general purpose of CMI, to inform the public that something is copyrighted in order to prevent infringement.  *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, 2012 WL 414803, at *6 (N.D. Ill. Feb. 8, 2012).  Some courts have held that the CMI must appear in the "body" or the "area around the work."  *Id.* at *7.  Other courts have held that "the term 'conveyed' is used in its broadest sense and is not meant to require any type of transfer, physical or otherwise, of the information. It merely requires that the information be accessible in conjunction with, or appear with, the work being accessed."  *Janik v. SMG Media, Inc.*, 2018 WL 345111, at *12 (S.D.N.Y. Jan. 10, 2018) (quoting S. Rep. No. 105–190 at 35 (1998)).

Further, some "[c]ourts . . . have generally required more than a boilerplate terms of use notice" to qualify as CMI.  *GC2 Inc. v. Int'l GameTech. PLC*, 255 F. Supp. 3d 812, 821 (N.D. Ill. 2017).  The Ninth Circuit recently held that an alleged CMI was not conveyed in connection with copyrighted photos on a webpage because: (1) the copyright notice was located at the bottom of the webpage in a shaded box separating it from the rest of the content on the webpage; (2) notice was generic and did not communicate that the defendants owned the photos; (3) defendants notice was not located on or next to the

copyrighted photos; and (4) the photos were imprinted with their own copyright markings. *SellPoolSuppliesOnline.com, LLC v. Ugly Pools Ariz., Inc.*, 804 F. App'x 668, 670 (9th Cir. 2020). But this conclusion is by no means universal. *See, e.g.*, *Pierson v. Infinity Music & Ent., Inc.*, 300 F. Supp. 3d 390, 395–96 (D. Conn. 2018) (holding the terms of use linked at the bottom of the webpage was conveyed in connection with the works); *Tomelleri v. Zazzle, Inc.*, 2015 WL 8375083, at *13 (D. Kan. Dec. 9, 2015) ("The Court does not believe that the phrase 'conveyed in connection with copies' . . . of the work requires that the information be located immediately adjacent to the image to qualify as CMI."). The Court must determine whether the copyright notices at issue here can be understood as conveyed in connection with the copyrighted work.

There were two copyright notices that appeared on www.coasterfurniture.com's product detail pages: the Website Copyright Notice and the Nothing on this Page Notice, both pictured below.



### a. Website Copyright Notice

The Website Copyright Notice does not fall under the definition of CMI because it was not conveyed in connection with the FDN Descriptions. To constitute "conveyed in connection with" information must appear in the body or area around the work. *Pers. Keepsakes,* 2012 WL 414803, at *6. This means that the CMI must at least suggest that it is associated with or linked to the copyrighted work. This rule is consistent with both the statutory text and the purpose of CMI—to place the public on notice that the work is subject to copyright protection. *Id.* "Such a rule prevents a 'gotcha' system where a

picture or piece of text has no CMI near it, but the plaintiff relies on a general copyright notice buried elsewhere on the website." *Pers. Keepsakes, Inc.*, 2012 WL 414803, at *7.

As with the copyright notice in *SellPoolSuppliesOnline.com, LLC*, FDN's Website Copyright Notice was not conveyed in connection with the FDN Descriptions because it was located at the bottom of the webpage, nowhere near the FDN Descriptions, and was generic, failing to indicate what exactly on the website it applied to. The only confident conclusion one can make is that the Website Copyright Notice applied to the website itself, not the individual components of the webpage. The Website Copyright Notice is also distinguishable from other notices that courts have found constituted CMI. For example, in *Levelyfilm, Inc. v. Fox Sports Interactive Media*, the copyright notice specifically stated "Photography: Don Levey, Don Levey Studio." 999 F. Supp. 1098, 1102–03 (N.D. Ill. 2014). Though the notice appeared on the back of the book, so it was physically separated from the copyrighted work, the court held it was CMI because the notice referred to the photography contained within the entire book. *Id.* But here, there is no language in the Website Copyright Notice that connects it to anything more specific than to FDN's vague intellectual property rights in the website that it "powered."

As the court stated in *Alan Ross Machinery Corp. v. Machinio Corp.*, "websites generally do not claim ownership or authorship over an image just because the image appears on the website." 2019 WL 1317664, at *8 (N.D. Ill. Mar. 22, 2019). The same holds true for text that appears on websites—website owners generally do not claim

ownership or authorship of every single piece of text on a webpage.  And FDN did not claim ownership in every portion of the website.  The Website Copyright Notice could not have plausibly placed any member of the public on notice that the specific FDN Descriptions were subject to a copyright owned by FDN.  The public would have had to make several non-obvious assumptions to reach such a conclusion.  Thus, the Website Copyright Notice does not constitute CMI.

Though FDN cites to *Advanta-Star Automotive Research Corp. of America v. Reynolds Ford, Inc.*, this case does not alter the Court's conclusion as to the Website Copyright Notice even though it discusses CMI in relation to text that appears on a webpage.  2020 WL 5823537 (W.D. Okla. Sept. 30, 2020).  In *Advanta-Star*, the copyrighted work was the text of car reviews.  *Id.* at *3.  Though the copyright notice appeared at the bottom of the webpage, the copyrighted work (i.e. the text) comprised almost the entire body of the webpages and there was not a significant degree of removal between the CMI in the footer and the copyrighted work.  *Id.* at 4.  Here, the FDN Descriptions do not take up the full webpage but only a small portion, there is a significant amount of space between the FDN Descriptions and the Website Copyright Notice, and the webpage allows a customer to navigate between different tabs so there may be an instance where the customer notices the Website Copyright Notice but the FDN Descriptions are no longer visible.

The location at the bottom of the webpage and the generic language of the Website Copyright Notice does not support the conclusion that the FDN Descriptions are associated with or linked to this notice.  Thus, the Website Copyright Notice was not conveyed in connection with the FDN Descriptions and does not fall under the definition of CMI.

### b.  Nothing on this Page Notice

The Nothing on this Page Notice, however, clearly falls under the definition of CMI as it was conveyed in connection with the FDN Descriptions.  The notice appears directly above the FDN Descriptions, in the middle of the page as opposed to at the bottom.  While there is a demarcation between the notice and the FDN Description (i.e. a line), the two sections are not entirely separate and unrelated.  Rather, the demarcations appear to be a design choice allowing a consumer to more easily navigate the webpage, not an intentional line communicating that the notice does not apply to the FDN Descriptions.  The Nothing on this Page statement places the public on notice that the text appearing immediately below it—the FDN Descriptions—are subject to copyright protections.  The Nothing on this Page Notice certainly falls under the requirement that CMI be in the area around the work as it appears as close as reasonably possible to the FDN Descriptions.  If the Nothing on this Page notice does not constitute CMI, it is unclear what would, other than placing the notice directly over the text, rendering the work unreadable.

52

Defendants claim that *Miles v. Netflix, Inc.* is apposite, but this case is distinguishable. *Miles* involved a copyright notice that appeared in text above a link to an embedded video. 2020 WL 548558 (C.D. Cal. Feb. 3, 2020). The court held that the plaintiff's DMCA claim failed because the copyright notice did not appear in the body of the copyrighted work, here a video. *Id.* at *3. The court implied that in order for the copyright notice to constitute CMI, it would have had to appear in the video itself. *Id.* But here, when the copyrighted work is text, where else could the copyright notice appear except for immediately above or next to the copyrighted work? Holding that a copyright notice must overlay the text is a nonsensical and impractical rule. The Nothing on this Page Notice falls under the definition of CMI.[16]

## 2.    Statute of Limitations

The statute of limitations for a DMCA claim is three years. 17 U.S.C. § 507(b). The Complaint was filed on January 26, 2018, therefore any alleged removal of CMI that occurred prior to January 26, 2015 falls outside the statute of limitations period unless

---

[16] Defendants contend that the Nothing on this Page Notice cannot constitute CMI because it is incorrect. Defendants allege that FDN did not own all the content on the website, so its permission was not required to copy all elements of the webpage, as claimed in the notice. Defendants do not point to any statutory language or case law that supports the proposition that a copyright notice cannot constitute CMI because it may be slightly inaccurate. Following Defendants assertion to its logical conclusion, they would ask the Court to craft a rule that requires any copyright notice to be intricately detailed as to which of the hundreds of elements on a webpage it applies to and to which it does not. Such a rule places an unreasonable burden on copyright owners and webpage operators. Furthermore, it is unclear whether FDN did own copyright interests in the entire webpage or not. Regardless, Defendants assertion is immaterial to the determination that the Nothing on this Page Notice is CMI.

that period is tolled.  The statute of limitations can be tolled by the discovery rule.  Courts within the Eighth Circuit have uniformly applied the discovery rule in copyright-infringement cases.  *Design Basics, L.L.C. v. Carhart Lumber Co.*, No 8:13-cv-125, 2016 WL 424974, at *3 (D. Neb. Feb. 3, 2016).[17]  And district courts outside the Eighth Circuit have applied the discovery rule to claims under § 1202, holding that the Copyright Act's statute of limitations provision applies to all of Title 17 and therefore so too does the application of the discovery rule.  *Hirsch v. Rehs Galleries, Inc.*, No. 18-cv-11864, 2020 WL 917213, at *4 (S.D.N.Y. Feb. 26, 2020); *DynaStudy, Inc. v. Houston Ind. Sch. Dist.*, 325 F. Supp. 3d 767, 775 (S.D. Tex. 2017).  The Court agrees and will apply the discovery rule to claims under § 1202.

Under the discovery rule, a cause of action accrues and the statute of limitations begins to run when the plaintiff discovers, or with due diligence should have discovered, the injury which is the basis of the litigation.  *Comcast of Ill. X v. Multi-Vision Elecs., Inc.*,

---

[17] The Court in *Design Basics*, discussed at length the impact, or lack thereof, of *McDonough v. Anoka County* on the application of the discovery rule to the copyright statute in the absence of a contrary directive from Congress.  2016 WL 424974, at *3 n.2.  The court noted that the Eighth Circuit, in *McDonough*, had deviated from its former presumption that the discovery rule always applies to a federal statute and instead conducted a textual analysis of a different federal statute to conclude that, based on the text, structure, and purpose of the statute, Congress may not have intended for the discovery rule to apply.  *Id.* (citing *McDonough v. Anoka Cty.*, 799 F.3d 931, 942 (8th Cir. 2015).  Because *McDonough* was not a copyright-infringement case nor did it consider *Patrella v. Metro-Goldwyn-Mayer, Inc*, 134 S. Ct. 1962, 1969 n.4 (2014), a case where the Supreme Court noted, but did not opine on nine Circuit Courts having adopted the discovery rule in copyright-infringement cases, the court declined to deviate from past practice in the circuit of applying the discovery rule to copyright-infringement cases.  *Id.*  The Court finds the reasoning in *Design Basics* persuasive and will continue to apply the discovery rule to copyright-infringement cases.

491 F.3d 938, 944 (8th Cir. 2007). The inquiry centers on what a reasonable person would discover. *Id.* Other Circuits have determined that a reasonably diligent plaintiff should discover the injury if they are put on inquiry notice of the infringement. *See e.g, Warren Freedenfeld Assocs. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008); *William A. Graham Co. v. Haughey*, 568 F.3d 425, 438 (3d Cir. 2009). A plaintiff is put on inquiry notice once it possesses information regarding the culpable conduct which suggest a reason to investigate. *Haughey*, 568 F.3d at 438. Defendants bear the initial burden of demonstrating the existence of storm warnings and, if they do, the burden shifts to the plaintiff to show it exercised reasonable due diligence and was still unable to discover its injuries. *Id.*

Defendants assert that once FDN discovered its CMI was removed, even though it did not know the identity of the wrongdoer, the statute of limitations began to run. This is not the rule. FDN must show that it exercised reasonable due diligence but was unable to discover its injuries or who the perpetrator of that injury was despite its efforts. Defendants cite *Gecker v. General Electric Capital Corp.,* a case in the Northern District of Illinois, which analyzes the Minnesota discovery rule to support of their assertion. No 14-8447, 2015 WL 5086398, at *13 (N.D. Ill. July 27, 2015). But, this case is inapplicable as it applies Minnesota state law, not federal law.

There is no case from the Eighth Circuit which stands for the proposition that a statute of limitations still begins to run when a plaintiff was placed on notice of an injury,

exercised due diligence, and could not discover the identity of the wrongdoer. The Court will not create such a rule today as it is unreasonable in the Internet era. Such a rule would require a copyright owner who places their copyrighted work online and then realizes that the CMI was removed to determine who among the millions of people, companies, or bots actually removed that CMI. This purported rule would then require a copyright owner who has discovered that their CMI has been removed but has not yet identified the perpetrator to file suit against the unknown wrongdoer to avoid foreclosure of vindicating their rights due to the statute of limitations. This is untenable.

If, after reasonable due diligence, the plaintiff is unable to discover who the wrongdoer is, their claims remain viable and are not barred by the statute of limitations. Therefore here, Defendants must first show that FDN had inquiry notice of the injury and if they can make such a showing, FDN has the burden to show it exercised reasonable due diligence and yet could still not discover the alleged injury or who committed that injury.

FDN was aware that the FDN Descriptions were appearing on Amazon product detail pages without the CMI as early as 2013. The factual record clearly shows that FDN as of 2013, had inquiry notice that its CMI was being removed from the FDN Descriptions, thus giving rise to claims under the DMCA. Defendants have met their burden of showing not only were there storm warnings, but that FDN had discovered the actual injury, though it had not yet identified the wrongdoer. The burden then shifts to FDN to show

that it exercised reasonable due diligence to discover who the wrongdoer was but was unable to do so.

Neither party fully addresses the issue of reasonable due diligence in their briefs. There are facts in the record which create a genuine dispute as to whether FDN exercised reasonable due diligence in investigating the injury after it discovered the FDN Descriptions were appearing on Amazon without CMI.   FDN hired a company to investigate the alleged infringement, sent communications to Amazon regarding the issue, and points to evidence that it reasonably believed the CMI was removed by third-party marketplace sellers.  FDN did not completely fail to undertake an investigation such that the Court can rule as a matter of law on the issue.  As such, it will be for a jury to determine whether FDN exercised reasonable due diligence in investigating the appearance of the FDN Descriptions on Amazon's product detail pages without CMI.

Therefore, the Court will not rule as a matter of law that FDN's claims of violations under § 1202 are time barred by the statute of limitations and the discovery rule.  Rather, genuine disputes of material fact remain as to whether FDN exercised reasonable due diligence to discover who removed the CMI and how.

### 3.    Claims Under § 1202(b)(3)

FDN brought claims against Defendants for violations of 17 U.S.C. §§ 1202(b)(1) and 1202(b)(3).  Section 1202(b)(3) states that "No person shall . . . **distribute,** import for **distribution,** or publicly perform works, copies of works, or phonorecords, knowing that

the copyright management information has been removed or altered without authority of the copyright owner or the law[.]"  17 U.S.C. § 1202(b)(3) (emphasis added).

Distribution is not defined in the statute.  Though the Eighth Circuit has defined distribution as "actual dissemination of either copies or phonorecords," this definition is not as particularly instructive here given the facts at issue.  *Nat'l Car Rental Sys. Inc. v. Comp. Assocs Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir. 1993).[18]  The issue here is more complicated because the factual record only indicates that Defendants publicly displayed FDN Descriptions on their website without CMI.  Defendants argue that public display does not constitute distribution, and thus is not a violation of § 1202(b)(3).  Defendants are correct.  Defendants' actions—the display of FDN Descriptions on Amazon product detail pages—do not constitute distribution for two reasons.

First, Congress has consistently separated public display from distribution in the Copyright Act.  Take § 106 as an example.  Section 106 enumerates the six exclusive rights of a copyright owner including the right to reproduction, **distribution**, public performance, and **public display**.  17 U.S.C. § 106 (emphasis added).  If distribution included public display, then it would be superfluous for Congress to include public display as a separate exclusive right for a copyright owner when that right would be encompassed

---

[18] Defendants argue that this definition requires a transfer of copies and since they have only made them available for viewing, their actions do not constitute distribution.  But this issue cannot be dealt with so quickly.  In *National Car*, the Eighth Circuit was not dealing with displaying allegedly copyrighted work online, which is the crux of the analysis here.  Therefore, the Court must engage in a lengthier discussion in order to properly address the issue.

by the right to distribute.  Following FDN's interpretation that distribution includes public display would result in a violation of the canon against superfluity.  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011) ("[T]he canon against superfluity assists only where a competing interpretation gives effect to every clause and word of a statute."). Interpreting distribution and public display to be separate concepts better aligns with this canon.  So, if Congress wanted to include public display as a violation of § 1202(b)(3) it certainly could have done so by specifically including public display in the statutory language.  Congress chose not to do so, and the Court will not read public display into § 1202(b)(3)'s use of the term distribution.

This conclusion is further bolstered by the fact that public performance is considered a violation of § 1202(b)(3) but public display is not.  Congress frequently discussed both concepts together, such as its reference to both in the definition of publication.  17 U.S.C. § 101.[19]  Congress was fully aware of the two distinct concepts and had the ability to express them both separately, as it did many time throughout the

---

[19] FDN argues that including public display under § 1202(b)(3) is in line with the goal of the DMCA, to "adapt" copyright protections to "digital networks" and "keep pace with emerging technology."  S. Rep. No. 105-190, at 2 (1998).  While the Court agrees that this was the purpose of the DMCA, this purpose does not support altering the statutory text.  Congress could have, and knew how to, include public display in the statute.  Its choice not to must be respected. Furthermore, omission of public display from § 1202(b)(3) does not wholly undermine the purpose of the DMCA as FDN contends.  There are still several acts that can occur, and do occur, under which a copyright owner can sue under § 1202(b)(3) outside of public display.

statute.  The Court sees no reason why Congress would not include public display in §

1202(b)(3) other than that it is public display does not constitute a violation of the DMCA.

Second, the parties quarrel over whether a distribution constitutes a publication,

therefore rendering any definition or description of publication applicable to distribution.

Defendants argue that all distributions are publications; FDN argues the opposite, that

publication is narrower than distribution.[20]  The court in *Capital Records, Inc. v. Thomas*

undertook a lengthy and instructive discussion of whether distribution as used in § 106(3)

was synonymous with publication under § 101.  579 F. Supp. 2d 1210, 1219–20 (D. Minn.

2008).[21]  The court concluded that "[t]he statutory definition of publication is broader

than the term of distribution[.]"  *Id.* at 1220.  The court held that "all distributions within

the meaning of § 106(3) are publications [but] not . . . all publications within the meaning

of § 101 are distributions."  *Id.*

Looking at the definition of publication under § 101, this reasoning holds true.

Publication is either the "distribution of copies or phonorecords of a work to the public

by sale or other transfer of ownership, or by rental lease or lending" or it is the "offering

---

[20] FDN incorrectly claims that Defendants are arguing publication and distribution are synonymous.  They are not.  Rather, they argue that distributions fall under the broader category of publication.  Defendants' argument is akin to the age-old maxim that while not all rectangles are squares, all squares are rectangles.

[21] While the court in *Capital Records* was discussing the definition of "distribution" as used in § 106, the Court concludes that the term distribution is consistent throughout the Copyright Act and therefore any discussion of distribution in § 106 equally applies to § 1202(b)(3).  *Estate of Cowart v Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) (discussing the "basic canon of statutory construction that identical terms within an Act bear the same meaning.").

to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display." 17 U.S.C. § 101. The first definition of publication defines a distribution, but the second definition allows for a publication to occur by the offering to distribute, which does not constitute an actual distribution. Thus, Defendants' assertion that publication is a broader than distribution is correct. So, it follows that if all distributions to the public are publications, if an action cannot constitute a publication, it also cannot constitute a distribution.

The statutory language is clear, public display by itself does not constitute publication. *Id*. Courts and the Copyright Office agree that uploading material online without providing for a means of downloading, printing, saving, or emailing, does not constitute publication. *See, e.g.*, *Rogers*, 887 F. Supp. 2d at 733; *Kernal Records Oy*, 794 F. Supp. 2d at 1364; Compendium 1008.3(B) ("[T]he statutory definition is clear that the public performance or public display of a work does not, in and of itself, constitute publication."). The record does not show, and FDN does not argue, that when Defendants uploaded the material online they provided for any means of downloading, printing, saving, or emailing. Therefore, no genuine dispute remains that Defendants' actions of public display did not constitute a distribution under § 1202(b)(3). The Court will grant

Defendants' motion for summary judgment on the § 1202(b)(3) claims and dismiss them.[22]

### 4. § 1202(b)(2) Requirement that Defendants Know or Have Reasonable Grounds to Know that Conduct Will Induce, Enable, Facilitate, or Conceal an Infringement

Section 1202(b)(1) prohibits the "intentional[ ] removal or alter[ation] [of] any copyright management information . . . knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement[.]" Section 1202(b) has a double scienter requirement. A plaintiff bringing a claim under § 1202(b)(1) must show not only that Defendants intentionally removed or altered CMI but that they did so knowing or having reasonable ground to know that removal would induce, enable, facilitate, or conceal infringement. A plaintiff can demonstrate actual or constructive knowledge by showing a past 'pattern of conduct' or 'modus operandi' that the defendant was aware of or had reasonable grounds to be aware and which put defendant on notice of the probable future impact of its actions. *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674 (9th Cir. 2018). This knowledge requirement may also be met if the plaintiff can show that

---

[22] FDN cites several cases for the proposition that displaying content online constitutes distribution under § 1202(b)(3). *Mango v. Buzzfeed*, 356 F. Supp. 3d 368, 377–78 (S.D.N.Y. 2019); *Ward v. Compound Ent. LLC*, 2020 WL 6136293, at *5 (S.D.N.Y. Apr. 27, 2020); *Reilly v Commerce*, 2016 WL 6837895, at *11 (S.D.N.Y. Oct. 31, 2016); *Stockart.com, LLC v. Engle*, 2011 WL 10894610, at *14 (D. Colo. Feb. 18, 2011). *Mango* is unpersuasive because the Court did not conduct an analysis of the definition of distribution, rather simply concluding that distribution had occurred. 356 F. Supp. 3d at 378. The remaining three cases were decided on default judgment and fail to meaningfully engage with the statutory text.

the defendant removed the CMI to conceal their own infringement.[23]  *Mango v. Buzzfeed, Inc.*, 970 F.3d 167, 172 (2d Cir. 2020) ("[A] defendant's awareness that distributing copyrighted material without proper attribution of CMI will conceal his own infringing conduct satisfies the DMCA's second scienter requirement."); *RBH Energy, LLC v. Partners in Church Consulting, LLC*, 2016 WL 6496362, at *1 (N.D. Tex. May 6, 2016).

FDN has presented sufficient evidence to establish that a genuine dispute of material fact remains on the question of whether Defendants knew or had reasonable grounds to know that their conduct would induce, enable, facilitate, or conceal an infringement.  Defendants' sole argument that FDN cannot prove this second scienter element centers on the fact that FDN did not use the CMI to police infringement.  They argue that since FDN never searched for CMI in looking for infringement, removal of it would not constitute concealment.  Defendants ignore the most obvious argument though—removal of CMI can constitute concealment of Defendants' own infringement. If Defendants are liable for copyright infringement, it would be entirely reasonable for a jury to find Defendants had the requisite scienter under § 1202(b) because removal of the CMI would conceal their own infringement.  And FDN has identified evidence from which a reasonable jury could conclude Defendants were concealing their own infringement by removing the CMI.

---

[23] These rules are consistent because *Corelogic* never addressed whether a defendant's own infringement satisfied the second scienter requirement or § 1202(b).  *Accord Mango*, 970 F.3d at 174.

Furthermore, FDN has pointed to sufficient evidence from which a jury could find Defendants knew or had reasonable grounds to know their actions would induce, enable, facilitate, or conceal third party infringement. Evidence shows that Defendants knew FDN owned the FDN Descriptions and despite this, the Defendants entered into an agreement by which Amazon personnel scraped and allegedly removed CMI from the FDN Descriptions. They then posted the FDN Descriptions on product detail pages where others could copy and impermissibly use the descriptions. FDN has also identified evidence which shows Amazon's documented history of intellectual property rights issues, noting that Amazon has admitted to receiving thousands of copyright infringement claims per year. And generally, the issue of constructive knowledge is a question of fact better left for the jury. *Dasler v. E.F. Hutton*, 1987 WL 5852, at *5 (D. Minn. Jan. 28, 1987). FDN has demonstrated that a genuine dispute remains as to whether Defendants had the requisite knowledge to be liable under § 1202(b)(2) and this question is properly left for the jury.[24]

---

[24] FDN makes a brief argument that the indemnification clause in the agreement between Amazon and Coaster also presents a triable issue of fact as to Defendants' knowledge in violating § 1202(b). In support of this contention, Defendants cite *Jedson Engineering, Inc. v. Spirit Construction Services* where the court held that an indemnification provision did create a genuine issue on this matter. 720 F. Supp. 2d 904, 931 (S.D. Ohio 2010). In *Jedson* the defendants **insisted** upon an indemnification provision in their negotiations indicating they knew their conduct would induce, enable, facilitate, or conceal infringement. *Id.* But existence of an indemnification clause alone does not create a genuine issue of fact on knowledge. Indemnification clauses are very standard in most contracts, often boilerplate. Here there is no evidence either party insisted on the inclusion of this clause so the existence of one in a contract is insufficient to raise a genuine issue of material fact.

### 5.     FDN's Injury Traceable to Alleged § 1202 Violation

In order to bring a cause of action under the § 1202, the plaintiff must show they were injured.  "Any person injured by a violation of . . . 1202 may bring a civil action."  17 U.S.C. § 1203.  Defendants argue that FDN has shown nothing more than speculative future harm of potential infringement.[25]  This is not so.  FDN has met the requirements of an injured person based solely on their allegations that Defendants' removal of CMI required FDN to undertake an investigation to discover where its content was appearing online.  Had Defendants not removed CMI, FDN could have avoided undertaking these efforts to uncover the true source and full extent of the alleged infringement.   Thus, the Court finds as a matter of law that FDN meets the requirements of injured person under § 1203 and can properly bring a claim under the DMCA.

Defendants briefly raise the issue of constitutional standing.   Constitutional standing under the DMCA is not a high bar.  *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 108 (1st Cir. 2008).  FDN need not show that it actually suffered financial harm, it is sufficient to show that a chain of events resulting from the removal of the CMI could result in harm to FDN.  *Id.*  Outside of the actual harm incurred by FDN in having to undertake the

---

[25] In support of this argument, Defendants point to *Steele v. Bongiovi*, 784 F. Supp. 2d 94 (D. Mass. 2011) and *Alan Ross*.  These cases are inapposite.  *Steele* involved entirely different facts that are not applicable here.  784 F. Supp. 2d at 98 (involving a plaintiff suing attorneys under the DMCA for allegedly altering copyright information which led to him losing his copyright infringement case).  *Alan Ross* is distinguishable because the only injury alleged by plaintiff was confusion in the market.  2019 WL 1317664, at *4.  FDN does not allege such an injury.

investigation, it has shown that by removing the CMI from FDN's Descriptions and placing the FDN Descriptions on Amazon product detail pages Defendants have significantly increased the likelihood of third-party infringement in addition to the cost of an investigation. This is sufficient to demonstrate constitutional standing. *Id.*

In sum, FDN is an injured party under the requirements of constitutional standing and § 1203.

### 6.    Statutory Damages under the DMCA

Under the DMCA, a plaintiff may seek actual damages and violator's profits, or they may seek statutory damages. 17 U.S.C. § 1203(c)(1). A party seeking statutory damages for a violation of § 1202 may elect to recover an award for each violation in the sum of not less than $2,500 or more than $25,000. *Id.* at § 1203(c)(3). A violation of § 1202(b)(1) occurs any time Defendants removed or altered CMI from the FDN Descriptions. The Court need not address any potential violations under § 1202(b)(3) as this claim is dismissed. Therefore, FDN's arguments regarding what constitutes distribution, such as the generation of a product detail page via Amazon's algorithm or the reuploading of the FDN Descriptions, are moot.

Defendants argue that FDN can show, at most, 27 statutory violations, which is the maximum number of potential batches in which Amazon added the FDN Descriptions to its database for use on product pages. Defendants conclude that this is correct because it is the number of Amazon files that were used to upload the FDN Descriptions into its

database.  (Decl. Doug Kidder Supp. Defs.' Mot. Summ. J. 1202 Claims, Ex. K-C at 158, May 14, 2021, Docket No. 507.)  Defendants briefly argue that because the FDN Descriptions constitute one work for the purpose of statutory damages under copyright infringement, FDN's statutory damages under the DMCA are further limited.

Defendants' arguments miss the mark for two reasons.  First, a violation of § 1202(b)(1) occurred every time Defendants removed or altered the CMI, not just when they uploaded the FDN Descriptions into their database.  FDN's assertion that a violation of the DMCA occurred when Defendants scraped the FDN Descriptions from www.coasterfurniture.com more appropriately defines a statutory violation of § 1202(b)(1) because it would be at this moment where the CMI was removed or altered. Second, the number of works registered to FDN is irrelevant as it relates to the number of violations of § 1202(b)(1).  *Sheldon v. Plot Commerce* is instructive on this point, as it held that the plaintiff could recover for multiple violations of § 1202(b)(1) as it related to only one copyrighted work.  2016 WL 5107072, at *17 (E.D.N.Y. Aug. 26, 2016).  FDN is not precluded from arguing that a violation of § 1202(b)(1) occurred every time Defendants removed or altered the CMI on one of its FDN Descriptions regardless of whether the FDN Descriptions constitute one work or not.

A genuine dispute remains as to how many times Defendants removed or altered CMI.  FDN's expert Carl Degen argues that Defendants scraped 2,022 FDN Descriptions from Coaster's website, thereby removing CMI 2,022 times.  (Kidder Decl., Ex. K-A at 97.)

67

Amazon's expert, Douglas Kidder, refutes this amount, identifies several errors in Degen's calculations, and presents his own number of descriptions that were scraped. (*Id.* at 37–39.) Kidder's number is also informed by the statute of limitations issue discussed above. (*Id.* at 38–39.) To make a determination on exactly how many statutory violations occurred would require the Court to weigh the evidence, make credibility determinations as to the parties' experts, and ultimately determine the truth of the matter. This is not the role of the Court on summary judgment. *Anderson*, 477 U.S. at 255. The parties present a classic battle of the experts which cannot be resolved here. As such, a genuine dispute of material fact remains on the number of statutory violations of § 1202(b)(1), if any, committed by Defendants and therefore this issue is better left for the jury.

### 7.   DMCA Claims Against Coaster

Coaster brought its own Motion for Summary Judgment asking the Court to dismiss the DMCA claims against it. As the Court has dismissed the § 1202(b)(3) claims, the Court need only separately consider the § 1202(b)(1) claim. Section 1202(b)(1) prohibits the intentional removal or alteration of CMI without the authority of the copyright owner knowing, or having reasonable grounds to know, that removal or alteration will induce, enable, facilitate, or conceal infringement. 17 U.S.C. § 1202(b)(1).

Though FDN alleges in its interrogatory response that "Coaster sent to Defendant Amazon documents, such as spreadsheets containing FurnitureDealer's copyright-protected product descriptions," FDN appears to have abandoned this argument in its

briefing. (3rd Harting Decl., Ex. 1 at 15.)  Furthermore, FDN's own expert, Hochman, stated that "Amazon has not identified a single infringing product description at issue that was provided by Coaster[.]"  (3rd Harting Decl., Ex. 2 ¶ 317.)  Therefore, based on this evidence and FDN's own statements, FDN does not allege that Coaster itself ever removed or altered CMI.  Rather, FDN's entire argument is based upon the assertion that Coaster is liable for the removal or alteration of CMI conducted by Amazon because Amazon was acting as Coaster's agent.

The common law of agency applies to analyses under the DMCA.  *Mavrix v. Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1053–54 (9th Cir. 2017) (collecting cases).  "[A]n agency relationships results from the manifestation of consent by one person that another shall act on his behalf and subject to his control, with a correlative manifestation of consent by the other party to act on his behalf and subject to his control."  *Moss*, 77 Wn.2d at 402–03.  As discussed in depth *supra* Part II.A.4.a, FDN has failed to present sufficient evidence that raises a genuine dispute that Amazon was acting as Coaster's agent.  The contractual language between Coaster and Amazon indicates that neither party consented to acting as the others agent.  (*See, e.g.*, 3rd Harting Decl., Ex. 7 ¶ 25.8 ("This Agreement will not create the relationship of agency[.]").)  Nor did Coaster control Amazon's actions.  The contract language shows that Amazon maintained control over its website entirely, and the evidence FDN pointed to in support of its control argument, at best, demonstrates that Coaster supervised Amazon's actions.  (Ko Decl., Ex.

1 ¶ 4(b), 4(k).)  While the Amazon Fulfillment Services Agreement between Coaster and Amazon affirmatively allowed Amazon to scrape product information from Coaster's website, this same agreement contained the explicit clause that the contract did not create an agency relationship.  (*Id.* ¶¶ 3, 25.8.)  Considering the entirety of the factual record before the Court, FDN has failed to point to any evidence that would create a genuine dispute that Amazon was acting as Coaster's agent.  Thus, since no other evidence exists from which a reasonable jury could find Coaster liable under the DMCA, the Court will grant Coaster's Motion for Summary Judgment and dismiss all DMCA claims against it.

### C.  Breach of Contract Claim Against Coaster

FDN asserts a breach of contract claim against Coaster stemming from the 2010 Agreement.  FDN alleges that Coaster breached the Referral Provision of the 2010 Agreement[26] which states: "COASTER understands and agrees that the license fee set forth in this Agreement is discounted significantly in exchange for COASTER facilitating new business for FURNITUREDEALER.NET.  Specifically, COASTER agrees to refer its

---

[26] Coaster asserts that because a breach of the Referral Provision was not alleged in the Amended Complaint, FDN cannot plead it for the first time in a motion for summary judgment. The Court directly addressed this issue in its Order on Coaster's Motion to Dismiss, stating that "[w]hile FDN does not explicitly identify [the Referral Provision] in the Amended Complaint, the Court finds that the claim may fairly be read to allege that Coaster breached this provision of the Agreement by failing to refer Amazon to FDN." (Order Coaster's Mot. Dismiss, at 24.)  The Court concludes once again that the claim of a breach of the Referral Provision was alleged in the Amended Complaint.

authorized dealers to FURNITUREDEALER.NET to execute a website license agreement

with FURNITUREDEALER.NET." (1st Harting Decl., Ex. 3 at Exhibit D, ¶ 3.)[27]  Both parties

have filed Motions for Summary Judgment on the breach of contract claim.

### 1.   Preemption by the Copyright Act

A state law claim is preempted under § 301 of the Copyright Act if "(1) the work at

issue is within the subject matter of the copyright as defined in §§ 102 and 103 of the

Copyright Act, and (2) the state law created right is equivalent to any of the exclusive

rights within the general scope of the copyright as specified in § 106." *Nat'l Car Rental*

*Sys., Inc.*, 991 F.2d at 428.  The exclusive rights granted in § 106 includes the right to

reproduce the copyrighted work, to distribute copies of the work, and to display the work

publicly.  17 U.S.C. § 106.  If an extra element is required to prove the state law claim

instead of or in addition to reproduction, performance, distribution, or display, then there

is no preemption.  *Nat'l Car Rental Sys.*, 991 F.2d at 431.

Coaster argues that the Referral Provision is not qualitatively different from a

prohibition on impermissibly using FDN's content because the "sole purpose of the

referral provision[] was to ensure that any use or copying of Coaster furniture descriptions

that FDN asserts it owns was not done so without FDN's authorization."  (Coaster Mem.

---

[27] FDN makes clear that it is not alleging that Coaster violated the 2010 Agreement by using the content in ways not authorized by the contract.  As FDN has dropped the assertion that the contract was breached by Coaster reproducing, distributing or displaying the FDN Descriptions, the Court need not consider that argument here on summary judgment.

Opp. FDN's Mot. Summ. J., at 28, June 25, 2021, Docket No. 560.)  But as the Court has previously held, this provision creates rights different from those protected by the Copyright Act—the right to have Coaster refer its authorized dealers to FDN.  The right to the referral is not equivalent to any of the exclusive rights within the general scope of § 106 even if one of the purposes of the referral was to ensure FDN approved any use or copying of the FDN Descriptions.

Under the framework established by the Eighth Circuit, the question of preemption turns on whether the right is infringed by the mere act of reproduction, performance, distribution, or display.  *Nat'l Car Rental Sys.*, 991 F.2d at 431.  Here, if an authorized dealer were to reproduce, perform, distribute, or display the FDN Descriptions, this would not breach FDN's right to referral by Coaster.  In fact, one can easily imagine a situation where an authorized dealer was referred, FDN chose not to work with the authorized dealer, and the authorized dealer then displayed the FDN Descriptions online.  While these actions may constitute copyright infringement, they would not give rise to a breach of contract claim against Coaster under the Referral Provision.  The Referral Provision requires that FDN establish an extra element, that Coaster failed to refer the authorized dealer to FDN, in order to bring a claim for breach of the provision.  Therefore, the Referral Provision is not preempted by the Copyright Act.

### 2.   Coaster's Alleged Breach of the Referral Provision

#### a.  Elements of a Contract Under Minnesota Law

The parties dispute the elements of a breach of contract claim under Minnesota law. Under this Court's most recent recitation of the standard, in order to assert a breach of contract claim under Minnesota law, the plaintiff must demonstrate: (1) a valid contract; (2) performance of any conditions precedent; and (3) breach of the contract. *Josephs v. Marzen & Press Media Grp., Inc.*, 2022 WL 45041, at *4 (D. Minn. Jan. 5, 2022) (citing *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014)). Coaster argues that this is an incorrect recitation of the elements of breach of contract because both materiality and damages are required. The Court will consider each alleged element in turn.

It is not a required element of a breach of contract claim to show that the breach was material. The most recent discussion of the elements of a breach of contract from the Minnesota Supreme Court[28] does not list "material" as a requirement. *Lyon*, 848 N.W.2d at 543. But the Minnesota Supreme Court, in *Lyon* did not directly address whether materiality is a required element, and the Court has found no other Minnesota Supreme Court case directly on point. The Minnesota Court of Appeals has held that the issue of materiality is relevant when determining whether the nonbreaching party is

---

[28] In resolving substantive issues of state law, the federal courts are bound by decisions of the Minnesota Supreme Court. *Integrity Floorcovering, Inc. v. Broan-Nuton, LLC*, 521 F.3d 914, 917 (8th Cir. 2008). When a state supreme court has not directly addressed a question before the district court, the Court must attempt to predict how the state supreme court would decide and "may consider relevant state precedent, analogous decisions, considered dicta . . . and any other reliable data." *Id.*

excused from future performance under the contract.  *See, e.g.*, *Griffin v. Abrahamson*, 2012 Minn. App. Unpub. LEXIS 1061, *5 (Minn. Ct. App. Nov. 5, 2012); *Eagle Shores Hospitality, Inc. v. Karkos*, 2005 WL 2207678, at *1–2 (Minn. Ct. App. Sept. 13, 2005).

This understanding of when materiality is relevant is in line with the case law cited by Coaster.   In *Boatwright Construction, Inc. v. Kemrich Knolls*, while the Minnesota Supreme Court discussed materiality, they only did so in assessing whether the nonbreaching party was excused from future performance.  238 N.W.2d 606, 607 (Minn. 1976).  Coaster cites to *Nelson v. American Family Mutual Insurance, Co.* which included a material breach as one of the elements of a contract.  899 F.3d 475, 480 (8th Cir. 2018). But the main issue in that case did not center on materiality and therefore the case is not instructive here given the more recent case of *Lyons*.  Based on the appellate court rulings, the issue of materiality is required only when a nonbreaching party is asking to be excused from further performance, but it is not a required element for every breach of contract case  under  Minnesota  law.[29]    As  FDN  is  not  seeking  to  be  excused  from  future performance, materiality is not relevant here.

Like materiality, no Minnesota Supreme Court case has directly addressed whether damages is a required element of a breach of contract claim.  In *Lyons*, the state supreme

---

[29] This is in line with the common law understanding of materiality as well.  Materiality goes to the type of breach (i.e. total or partial) and relates to whether a party is immediately excused from performance or must perform the entire contract before suing.  10 Corbin on Contracts § 53.4.  But regardless of the size of the breach, the law will give an immediate remedy. *Id.*

court did not list it as an element, however, *Lyons* contained a limited discussion on a breach of contract claim, not reaching the issue of damages.  848 N.W.2d at 544.  Since there is no state supreme court case directly on point, the Court must consider  relevant state precedent, analogous decisions, considered dicta, and any other reliable data. *Integrity Floorcovering, Inc.*, 521 F.3d at 917.

But unlike materiality, the Minnesota Court of Appeals has expressly addressed whether damages are a required element.  Most recently, in 2019, the Minnesota Court of Appeals held that "[a] claim for breach of contract fails as a matter of law if the plaintiff cannot establish that he or she has been damaged by the alleged breach."  *Beeuwsaert v. Shah & Co.*, 2019 WL 1006974, at *3 (Minn. Ct. App. Mar. 4, 2019) (citing *Jensen v. Duluth Area YMCA,* 688 N.W.2d 574, 578–79 (Minn. Ct. App. 2004)).  Several other cases have held the same.  *Logan v. Norwest Bank Minn., N.A.*, 603 N.W.2d 659, 663 (Minn. Ct. App. 1999); *Nguyen v. Control Data Corp.*, 401 N.W.2d 101, 105 (Minn. Ct. App. 1987).

Based on the express language found in the relevant state court precedent, the Court concludes that damages are a required element of a breach of contract claim under Minnesota law and predicts that the Minnesota Supreme Court would hold the same. This conclusion is in line with this Court's prior holdings.  *See, e.g.*, *Steady State Imaging, LLC v. GE*, 2019 WL 1491934, at *6 (D. Minn. Apr. 4, 2019) ("To succeed in a breach of contract claim, a plaintiff must show that damages resulted from or are caused by the breach.").  In order to survive summary judgment, then, on its breach of contract claim,

FDN must show that at least a genuine dispute of material fact remains as to the question of damages.

### b. Alleged Breach of the Referral Provision

FDN must show that a genuine dispute of material fact remains on the question of breach as well as damages. "Construction of an unambiguous contract is a legal question for the court, while construction of an ambiguous contract is a factual question for the jury." *Lemond Props., LLC v. Chart Inc.*, 2018 WL 490976, at *2 (D. Minn. Jan. 19, 2018) (citing *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003)). "A contract is ambiguous if it is reasonably susceptible to more than one interpretation." *Id.* (quoting *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997)). If FDN can show that the Referral Provision is ambiguous, FDN has met its burden, and whether Coaster violated the provision is a question better left for the jury.

FDN asserts that Coaster breached the Referral Provision of the 2010 Agreement by failing to refer Amazon to Coaster. In support of this assertion, FDN points to testimony by Coaster's former Vice President of Marketing & e-Commerce Sales, Toby Konetzny, who stated that Amazon was an authorized dealer, and that Coaster did not ever refer Amazon to FDN. (1st Harting Decl., Ex. 12 at 67:20–22.) Coaster disagrees, stating that it complied with the Referral Provision when Coaster allowed FDN to set up a booth in its showroom at several furniture trade shows. Coaster alleges that FDN would solicit business from Coaster customers at these shows, and that Amazon was one of

those customers in attendance.  (Decl. Toby Konetzny Opp. FDN's Mot. Partial Summ. J.,

¶¶ 8–10, 14, June 25, 2021, Docket No. 570.)[30]

The 2010 Agreement simply states that Coaster will refer authorized dealers to

FDN, but it fails to clarify how Coaster was to go about this referral and whether providing

FDN access to Coaster customers at trade shows satisfied the referral requirement.  The

evidence submitted by both parties far from clarifies the ambiguity in this contractual

provision.  While Koneztny testified that it was his belief Coaster never referred FDN to

Amazon, this does not necessarily mean that Coaster breached the Referral Provision.  A

jury could still find, based on the evidence, that Coaster complied with the Referral

Provision requirements when it provided FDN a booth in its showroom at trade shows.

There is sufficient evidence to establish that the Referral Provision is ambiguous and

therefore, the question of whether Coaster breached the contract is a question better left

for the jury.

### c.  Damages

---

[30] FDN argues that the declaration by Konetzny cannot alone create a genuine dispute of
material fact because it directly contradicts his deposition testimony.  But Konetzny's Declaration
is not contradictory to his deposition testimony.  Konetzny testified in his deposition about the
showrooms and that the showrooms were an avenue for FDN to reach Coaster's dealers.  (1st
Harting Decl., Ex. 12 at 66:4–67:12.)  He also testified that Coaster never referred Amazon.  (*Id.*
at 67:20–25.)  But his declaration does not contest the assertion that Coaster never referred
Amazon, rather it provides more detail on the showrooms and FDN's booth at the furniture
shows.  Nowhere does Konetzny assert in his declaration that Coaster did refer Amazon or even
that he believed by allowing FDN access to the showroom that they were fulfilling the
requirements of the Referral Provision.  Therefore, the Court can consider both Konetzny's
testimony and declaration.

"To succeed in a breach of contract claim, a plaintiff must show that the damages result from or are caused by the breach." *Steady State Imaging, LLC*, 2019 WL 1491934, at *6 (quoting *Nguyen*, 401 N.W.2d at 105). FDN claims that it has established it is entitled to damages resulting from Coaster's failure to refer Amazon, which includes extensive and foreseeable costs and legal fees[31] in connection with FDN's efforts to remove the infringing content from Amazon, as well as nominal damages.[32] Coaster contends that FDN has not pointed to any evidence that damages flowed from its alleged breach because the record shows that FDN would never have capitalized on a referral to Amazon. (Decl. Mark Nielson Supp. Coaster's Mot. Summ. J., Ex. 1 at 23:5–28:24, May 14, 2021, Docket No. 452.) Coaster misses the point. As it even admitted in its brief in opposition to FDN's motion for summary judgment, "[t]he sole purpose of the referral provision was to ensure that any use or copying of Coaster furniture descriptions that FDN asserts it

---

[31] Coaster makes the brief argument that FDN cannot seek legal fees because attorney fees and costs were not provided for in the 2010 Agreement and "attorney fees are not recoverable in litigation unless there is a specific contract permitting . . . such recovery." *Dunn v. Nat'l Beverage Corp.*, 745 N.W.2d 549, 554 (Minn. 2008). FDN is not, however, seeking legal fees solely because it is the prevailing party. Rather, FDN is seeking costs and legal fees incurred directly as a result of Coaster's breach of the contract. FDN alleges that due to Coaster's breach of the contract, it had to expend costs and fees on the litigation to end the infringement. FDN is not precluded from arguing for these damages at trial because they flow directly from Coaster's alleged breach.

[32] Coaster's assertion that FDN only intends to seek nominal damages misconstrues FDN's Sixth Supplemental Rule 26(A)(1) Initial Disclosure which makes clear that Coaster's "failure to comply with its contractual obligations . . . forced [FDN] to incur extensive and foreseeable costs and legal fees[.]" (Decl. Alyssa Lawson Opp. Defs.' Mot. Strike, Ex. 1 at 20, Dec. 12, 2020, Docket No. 383.)

owns was not done so without FDN authorization." (Coaster Mem. Opp. FDN's Mot. Summ. J., at 36, June 25, 2021, Docket No. 560.)

This is precisely what FDN argues as well; because Coaster breached the Referral Provision FDN was denied the opportunity to notify Amazon that Amazon was not authorized to use FDN Descriptions or take precautionary measures to prevent infringement. Because it was denied this opportunity by Coaster's alleged breach, FDN incurred damages by having to pursue this litigation. *Accord Valley Paving, Inc. v. Stanley Consultants, Inc.*, 2016 WL 2615956, at *18 (Minn. Ct. App. May 9, 2016) (holding that plaintiff could argue for damages because the plaintiff could say with certainty some damages existed and had the breach not occurred they would have taken action that would have prevented damages). Thus, the Court cannot hold as a matter of law that FDN is not entitled to damages based on Coaster's alleged breach of the Referral Provision.

Nor can the Court reserve the issue of damages for resolution after trial, as requested by FDN. "The amount of damages is a question of fact[.]" *Randy Kinder Excavating, Inc. v. JA Manning Constr., Co.*, 899 F.3d 511, 520 (8th Cir. 2018). Therefore, the Court concludes that the issue of damages is best left for the jury to determine.

### D. Covenant of Good Faith and Fair Dealing Claim Against Coaster

In Minnesota, all contracts contain an implied covenant of good faith and fair dealing. *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn.

1995). A cause of action for good faith and fair dealing cannot exist independent of an underlying breach of contract claim. *Orthomet, Inc. v. A.B. Med.*, 990 F.2d 387, 392 (8th Cir. 1993). The covenant of good faith and fair dealing is breached when a party acts "dishonestly, maliciously, or otherwise in subjective bad faith" with respect to a provision of the contract. *BP Prods. N. Am. Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp. 2d 959, 968 (D. Minn. 2007). Other courts have found the covenant breached if the adverse party acted with an ulterior motive. *Minnwest Bank Cent. v. Flagship Props. LLC*, 689 N.W.2d 295 (Minn. Ct. App. 2004).

Though FDN points to evidence in the record from which, it argues, a jury could conclude Coaster had an ulterior motive in breaching the contract, the evidence cited is irrelevant here. The portions of the record that FDN cites deal with Coaster giving Amazon permission to use the FDN Descriptions. They do not concern the **Referral Provision** of the contract. Nor do they establish any ulterior motive behind Coaster's alleged breach of the Referral Provision. It is unclear to the Court how Coaster's relationship with Amazon would benefit from Coaster refusing to refer Amazon to FDN. At best, it appears that Coaster may have misunderstood its obligations under the contract or believed that it was, in good faith, complying with the Referral Provision. What the evidence does not show is that Coaster acted dishonestly, maliciously, or otherwise in subjective bad faith. Therefore, the Court will grant Coaster's Motion for Summary Judgment on the covenant of good faith and fair dealing claim and dismiss the claim against Coaster.

### E.   Defendants' Affirmative Defenses

FDN asks the Court to grant summary judgment on Defendants' affirmative defenses of safe harbor under 17 U.S.C. § 512 and express and implied licenses.   In response, both Coaster and Amazon withdrew these affirmative defenses.   (Defs' Mem. Opp. FDN's Mot. Summ. J. at 2–3.)   FDN states that the Court should still grant it summary judgment because Defendants pursued these affirmative defenses through the end of discovery and failed to notify FDN of any intent to withdraw them.   As such, FDN was required to defend against them up until Defendants withdrew.   FDN asserts that Defendants conduct is relevant to a judgment on attorneys' fees and costs.   The Court agrees that it will be relevant upon such motion in the future but fails to see how Defendants' pursual of the affirmative defenses mandates the Court to grant summary judgment on them.   At this stage, the Court will deny FDN's Motion for Summary Judgment on Defendants' affirmative defenses as moot.

## CONCLSUION

In sum, the Court will grant in part Coaster's Motion for Summary Judgment and dismiss the DMCA claims, the direct and vicarious copyright infringement claims, and the covenant of good faith and fair dealing claim against Coaster.   The Court will grant in part Defendants' Motion for Summary Judgment on the DMCA claims and dismiss the § 1202(b)(3) claim against Amazon.   The Court will deny FDN's Partial Motion for Summary Judgment.   Several issues remain that cannot be resolved at the summary judgment

stage, though the Court has winnowed down many of these issues as this case proceeds towards trial.

**ORDER**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. FDN's Partial Motion for Summary Judgment [Docket No. 435] is **DENIED**;

2. Coaster's Motion for Summary Judgment [Docket No. 447] is **GRANTED in part and DENIED in part**, as follows:

   a. **GRANTED** as to Counts I, III, IV, and VII; and

   b. **DENIED** with respect to all other claims.

3. Defendants' Motion for Summary Judgment on Plaintiff's Copyright Claim [Docket No. 491] is **DENIED**; and

4. Defendants' Motion for Summary Judgment on Plaintiff's 17 U.S.C. § 1202 Claim [Docket No. 501] is **GRANTED in part and DENIED in part**, as follows:

   a. **GRANTED** as to liability alleged under § 1202(b)(3);

   b. **GRANTED** as to Coaster's liability under 17 U.S.C. § 1202; and

   c. **DENIED** with respect to all other claims.

DATED: March 25, 2022
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
United States District Judge